**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DIGITAL DREAM LABS, LLC, | ) | Civil Action |
| | ) | |
| Plaintiff, | ) | No. 2:20-cv-01500-CCW |
| | ) | |
| v. | ) | Judge Christy Criswell Wiegand |
| | ) | |
| LIVING TECHNOLOGY (SHENZHEN) | ) | |
| CO., LTD, d/b/a LIVING.AI and EMO PET, | ) | ***Electronically Filed*** |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS SECOND AMENDED COMPLAINT**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS .................................................................................................................i

TABLE OF AUTHORITIES .........................................................................................................ii

I.      INTRODUCTION ..............................................................................................................1

II.     ABBREVIATED FACTUAL BACKGROUND .................................................................1

III.    STANDARD OF REVIEW .................................................................................................5

IV.     ARGUMENT ......................................................................................................................6

   A.    DDL's allegations improperly parse aspects of the two asserted copyright registrations, and do not constitute infringement. .................................................................................6

      1.    The physical robots are different, and the typical robot characteristics identified are not separately protectable. ...................................................................................8

      2.    The copyright registrations do not protect individual animations or graphics combined with sounds. ...................................................................................11

      3.    The sounds cannot be divorced from the videos, and, in any event, they are not the same nor were they copied. ...................................................................................17

   B.    Factual reference to VECTOR robot's compatibility to EMO robot is fair use, not trademark infringement. .................................................................................18

   C.    Trade dress must be specifically identified, non-functional and source-identifying. The Second Amended Complaint fails on all of these requirements. .................................................................................20

V.      CONCLUSION .................................................................................................................23

## TABLE OF AUTHORITIES

**Cases**

*Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*,
  280 F.3d 619 (6th Cir. 2002) ............................................................................. 23

*Aliotti v. R. Dakin & Co.*,
  831 F.2d 898 (9th Cir. 1987) ............................................................................. 10

*Am. Beverage Corp. v. Diageo N. Am.*, Inc.,
  936 F. Supp.2d 555 (W.D. Pa. 2013) ................................................................ 20

*Argueta v. U.S. Immigration & Customs Enforcement*,
  643 F.3d 60 (3d Cir. 2011) ................................................................................... 5

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................................. 5

*Autodesk, Inc. v. Dassault Systemes Solidworks Corp.*,
  No. C 08-04397 WHA, 2008 WL 6742224 (N.D. Cal. Dec. 18, 2008) .............. 21

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................................. 5

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*,
  150 F.3d 132 (2d Cir. 1998 .................................................................................. 7

*Century 21 Real Estate Corp. v. Lendingtree, Inc.*,
  425 F.3d 211 (3d Cir. 2005) ............................................................................... 19

*Christianson v. W. Pub. Co.*,
  149 F.2d 202 (9th Cir. 1945) ............................................................................... 7

*Dam Things from Denmark v. Russ Berrie & Co., Inc.*,
  290 F.3d 548 (3d Cir. 2002 .................................................................................. 7

*Daniels v. Walt Disney Co.*,
  958 F.3d 767 (9th Cir. 2020) ............................................................................. 16

*Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*,
  307 F.3d 197 (3d Cir. 2002) ............................................................................... 16

*Duraco Prod., Inc. v. Joy Plastic Enterprises, Ltd.*,
  40 F.3d 1431 (3d Cir. 1994) ............................................................................... 22

*Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*,
  958 F.3d 532 (6th Cir. 2020) ......................................................................... 9, 10

*Fair Wind Sailing, Inc. v. Dempster*,
  764 F.3d 303 (3d Cir. 2014) ............................................................................... 20

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.,*
499 U.S. 340 (1991) ...........................................................................................7

*Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,*
30 F.3d 466 (3d Cir. 1994) ..............................................................................19

*Fowler v. UPMC Shadyside,*
578 F.3d 203 (3d Cir. 2009) ...............................................................................5

*Fusion Windows & Doors, Inc. v. Am. Reliable Windows, Inc.,*
No. CV 13-1022 PSG (JCX), 2013 WL 12126108 (C.D. Cal. July 12, 2013).......................6

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.,*
9 F.3d 823 (10th Cir. 1993) ..............................................................................16

*Ideal Toy Corp. v. Plawner Toy Mfg. Corp.,*
685 F.2d 78 (3d Cir.1982) ................................................................................22

*Inwood Labs., Inc. v. Ives Labs., Inc.,*
456 U.S. 844 (1982) .........................................................................................22

*Jackson v. Booker,*
465 F. App'x 163 (3d Cir. 2012)..........................................................................7

*Keurig, Inc. v. Strum Foods, Inc.,*
769 F. Supp.2d 699 (D. Del. 2011) ...................................................................19

*Landsberg v. Scrabble Crossword Game Players, Inc.,*
736 F.2d 485 (9th Cir. 1984) ............................................................................16

*Landscape Forms, Inc. v. Columbia Cascade Co.,*
113 F.3d 373 (2d Cir. 1997) .............................................................................20

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC,*
511 F.3d 350 (3d Cir. 2007) .............................................................................20

*Pellegrino v. Epic Games, Inc.,*
451 F. Supp.3d 373 (E.D. Pa. 2020).............................................................19, 20

*Phoenix Entertainment Partners, LLC v. Dr FOFO, LLC,*
No. 2:17-cv-03327-DNC, 2018 WL 4635988 (D.S.C. Sept. 27, 2018) ................18

*Santiago v. Warminster Twp.,*
629 F.3d 121 (3d Cir. 2010) ...............................................................................5

*Satava v. Lowry,*
323 F.3d 805 (9th Cir. 2003) ............................................................................10

*Tanikumi v. Walt Disney Co.,*
616 F. App'x 515 (3d Cir. 2015) .........................................................................6

*Tanksley v. Daniels,*
259 F. Supp.3d 271 (E.D. Pa. 2017)....................................................................6

*Treat, Inc. v. Dessert Beauty*,
  No. 05-923 PK, 2006 WL 2812770 (D. Or. May 5, 2006)....................................................21

*Tumblebus, Inc. v. Cranmer*,
  399 F.3d 754 (6th Cir. 2005) ...........................................................................................20

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
  529 U.S. 205 (1999) .........................................................................................................22

*Whelan Assocs., Inc. v. Jaslow Dental Lab, Inc.*,
  797 F.2d 1222 (3d Cir. 1986) ......................................................................................8, 16

*Winstead v. Jackson*,
  509 F. App'x 139 (3d Cir. 2013)..........................................................................................7

*Wolstenholme v. Hirst*,
  271 F. Supp.3d 625 (S.D.N.Y. 2017) ..................................................................................9

*Yurman Design, Inc. v. PAJ, Inc.*,
  262 F.3d 101 (2d Cir. 2001) .............................................................................................23

*Zella v. E.W. Scripps Co.*,
  529 F. Supp.2d 1124 (C.D. Cal. 2007) ................................................................................7

## Statutes

15 U.S.C. § 1052(e)(5)...........................................................................................................22
17 U.S.C. §101.................................................................................................................8, 12
17 U.S.C. §102.................................................................................................................8, 10
17 U.S.C. § 114(b) .................................................................................................................17

## Other Authorities

Compendium of U.S. Copyright Office Practices § 504.1 (3d ed. 2017) ...................................8, 11
Compendium of U.S. Copyright Office Practices § 806.4(C) (3d ed. 2017) ...............................15
Compendium of U.S. Copyright Office Practices § 806.4(D) (3d ed. 2017) ...............................15
Compendium of U.S. Copyright Office Practices § 807.2(B) (3d ed. 2017)................................17
Copyright Office Circular 45 .................................................................................................15

## Treatises

3 Patry on Copyright § 9:86.50................................................................................................7
4 Patry on Copyright § 12.20..................................................................................................14
Abrams & Ochoa, 1 The Law of Copyright § 2.43.50 ...............................................................14

## I.     INTRODUCTION

Despite repeated amendments, Digital Dream Labs, LLC ("DDL") still fails to state causes of action as a matter of law under any of the three remaining theories identified in its Second Amended Complaint ("SAC").[1] DDL continues to drop claims on each successive amendment – it has dropped its patent claims, some of its copyright claims and its tort claims. Even though it is reducing the number of its claims, DDL continues to paint a fuzzy picture of intellectual property rights without providing specific identification of what is actually protected and allegedly infringed. Each of the intellectual property-related causes of action in its SAC protect distinct and independent property interests. Just as a deed provides detailed contours of real property, so, too, a plaintiff must provide the metes and bounds of its claimed intellectual property in order to allege infringement. Intellectual property rights cannot be combined in an effort to obscure and overlook deficiencies in proving each separate claim. These theories demand clarity and specificity to survive. Living Technology (Shenzhen) Co., Ltd. d/b/a Living.AI d/b/a Emo Pet ("Living.AI") moves for dismissal of the SAC in its entirety. Though DDL bombards the Court with a variety of allegations, the impermissible blending of concepts, circular references and attempted bootstrapping of claims requires dismissal.

## II.     ABBREVIATED FACTUAL BACKGROUND

This is a case about robots. Specifically, toy robots powered by artificial intelligence. Whether it is C-3PO, Johnny 5 or WALL-E, robots are familiar, and consumers have become accustomed, through popular culture, to the idea of interacting with robots that can perform a variety

---

[1] Despite reference to "torts" in Paragraph 10 of the SAC, DDL represented to the Court that it has dropped its tort claims against Living.AI. The same is also true of references to unasserted patent, copyright and trademark registrations that still remain in the SAC. Thus, although DDL has continued to include this narrative, it is not relevant to analysis of any of the remaining claims.

of tasks.  These robots often exhibit human characteristics, including movements, gestures and physical traits, and even approximate human emotions.





Indeed, human physical traits, such as eyes, are depicted on these robots by everything from various mechanical components, to graphics on a screen, like BURN-E's "blue eyes".  The robots at issue in this case, just like their robot movie star counterparts, also have human-like traits and are powered by artificial intelligence to perform various functions and otherwise engage with a user.  DDL's two construction-vehicle style robots with the treads are known as VECTOR and COZMO, and Living.AI's skater-style robot is called EMO.  The three robots, VECTOR, COZMO and EMO, are depicted below (in that order).



These images are not to scale.  *See* Exhibit 1 to the Motion for photographs of COZMO, VECTOR

and EMO robots side-by-side.

DDL raises a series of grievances and complaints about the EMO robot and its concerns with having to compete in the marketplace with the EMO robot, many of which have absolutely nothing to do with the three asserted causes of action.[2]  The facts pertinent to this Motion are fairly straight-forward.  DDL acquired assets relating to the COZMO and VECTOR robots from a company called Anki, Inc.  The acquired assets included a range of preexisting intellectual property assets, including the VECTOR® federal trademark registration asserted in the SAC.  COZMO robots have been for sale in the United States since 2016, and VECTOR robots have been for sale in the United States since 2018.  After learning of the impending launch of EMO, DDL set about securing other intellectual property registrations, including its two asserted audiovisual copyright registrations which it only obtained in November 2020 (even after it filed its original Complaint in this Court), as a way to try to hinder EMO's launch in the United States.

Living.AI developed the EMO robot, and began marketing its EMO robot for release in the United States.  DDL became aware of social media posts by Living.AI relating to the EMO robot's impending launch on or about September 1, 2020.  (SAC ¶ 27).  On September 15, 2020, DDL was granted U.S. Copyright Registration Nos. SR 879-604 and SRu 1-424-806.  (SAC ¶ 21 and Exs. C and D).  Both of these copyright registrations are for sound recordings only, and although attached to the SAC and mentioned throughout the fact section of the SAC, they are no longer being asserted in this litigation.  On September 21, 2020, DDL filed a Notice of Copyright Violation with

---

[2] While Living.AI disagrees with the narrative supplied by DDL in the SAC, the focus of this Motion is the sufficiency of the causes of action as a matter of law, and thus Living.AI will refrain from addressing the inaccuracies in the SAC that are not pertinent to this Motion.  Living.AI is pointing this out explicitly because it does not want the absence of discussion on the factual inaccuracies in the SAC to be mischaracterized in other extra-judicial proceedings involving the parties with entities such as Kickstarter, Indiegogo and various social media platforms.

Indiegogo and requested the removal of Living.AI's EMO robot Indiegogo launch website based on these two copyright registrations and two design patents that are also no longer being asserted in this litigation. (SAC ¶ 55). Indiegogo suspended Living.AI's launch website based on DDL's request, although this suspension is in the process of being challenged by Living.AI.

On October 5, 2020, DDL filed its original Complaint in this matter. Thereafter, on November 13, 2020, DDL was granted U.S. Copyright Registration Nos. PA 2-266-064 and PA 2-266-065. (SAC ¶ 22 and Exs. E and F). Both of these copyright registrations claim to protect three dimensional sculptures and audiovisual work. DDL became aware of Living.AI's EMO robot launch website on Kickstarter, and filed Notices of Copyright Violation with Kickstarter requesting the removal of Living.AI's EMO robot Kickstarter launch website. (SAC ¶ 64). This time, DDL cited the additional new copyright registrations, and pointed to this pending litigation as a basis for removing Living.AI's Kickstarter launch website. Kickstarter removed and/or disabled Living.Ai's website on December 1, 2020.[3] (SAC ¶ 65). In addition to these third party websites, Living.AI also advertises the EMO robot on its own Living.AI website.

On December 28, 2020, DDL amended its Complaint in this litigation. On March 5, 2021, DDL amended its First Amended Complaint in this litigation. DDL's current iteration of its Complaint states three discrete causes of action: copyright infringement of two of the four attached registrations, trademark infringement of one of the two attached registrations, and an unregistered trade dress infringement claim.

---

[3] Living.AI vehemently opposes the takedown of its Indiegogo and Kickstarter EMO robot launch websites, as well as the attacks DDL initiated on Facebook, Instagram and YouTube, and is fighting these attacks through the resolution procedures established by each of these entities. Each entity has their own policies with regard to takedown of content, and none can be fairly characterized as having made a substantive determination of infringement of DDL's intellectual property rights.

## III.   **STANDARD OF REVIEW**

"To survive a motion to dismiss, a [pleading] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts must accept a pleading's factual allegations as true but are not bound to accept as true the pleading's legal conclusions. *Id.* In particular, to survive a Rule 12(b)(6) motion, a complaint must articulate sufficient plausible factual allegations to raise a right to relief beyond a speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Supreme Court clarified this standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009):

> *the pleading standard* Rule 8 announces does not require "detailed factual allegations," but it *demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. … A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do*." … Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." … To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." …. A claim has *facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable* for the misconduct alleged…. *The plausibility standard* is not akin to a "probability requirement," but it *asks for more than a sheer possibility that a defendant has acted unlawfully…. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief*.'"

556 U.S. at 678 (internal citations omitted; emphasis added). *See also e.g.*, *Argueta v. U.S. Immigration & Customs Enforcement*, 643 F.3d 60, 70–73 (3d Cir. 2011); *Santiago v. Warminster Twp.*, 629 F.3d 121, 129–30 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 209–211 (3d Cir. 2009). In short, as a matter of law, threadbare, conclusory statements are not sufficient to state a cause of action. The analytical framework is clear: first, a party should outline the elements required to be pled to state a claim for relief. *Argueta*, 643 F.3d at 73. Next, those allegations that are no more than conclusions and thus not entitled to the assumption of truth are peeled away. *Id.*

at 74. Finally, the Court looks for well-pled factual allegations, assumes their veracity, and then "determine[s] whether they plausibly give rise to an entitlement to relief." *Id.*

## IV.   ARGUMENT

### A.   DDL's allegations improperly parse aspects of the two asserted copyright registrations, and do not constitute infringement.

DDL alleges infringement of two Audiovisual Copyrights, the registration certificates of which are attached as Exhibits E and F of the SAC, and the video deposit materials have now been provided to the Court with the SAC. (*See* SAC ¶ 22). DDL claims these two copyright registrations protect "the copyrighted three-dimensional structure and audio-visual content, including, without limitation, audio 'voice', sounds, graphics and expressions used for DDL's VECTOR® and COZMO® toy robots." (SAC ¶ 1). DDL appears to be trying to break apart various aspects of the registered video deposits to allege infringement of discrete components, namely, (1) the three-dimensional sculpture of the robots depicted in the videos; (2) four specific "animation/sound" excerpted clips from the videos it claims appear on the Living.AI website (SAC ¶ 50), and (3) ten excerpted clips (eight animation clips, one animation and sound clip, and one sound-only clip) from the videos it claims appeared on Living.AI's Kickstarter campaign video. (SAC ¶ 61). As described below, each type of claim fails. The claims fail because the discrete items claimed are not copyrightable as a matter of law. Moreover, the claims fail because even if such discrete items were capable of being independently asserted as a basis of infringement, they are not substantially similar, as a matter of law, and thus the claims would fail in any event.

Claims of copyright infringement can be dismissed pursuant to Rule 12(b)(6) where it can be facially determined that the accused work is not substantially similar to protectable aspects of the alleged copyrighted work. *See Tanikumi v. Walt Disney Co.*, 616 F. App'x 515, 521 (3d Cir. 2015); *Tanksley v. Daniels*, 259 F. Supp.3d 271, 280-81 (E.D. Pa. 2017); *Fusion Windows & Doors,*

*Inc. v. Am. Reliable Windows, Inc*., No. CV 13-1022 PSG (JCX), 2013 WL 12126108, at \*3 (C.D. Cal. July 12, 2013) (citing *Christianson v. W. Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945) ("[W]hen the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on motion to dismiss.")); *Zella v. E.W. Scripps Co.*, 529 F. Supp.2d 1124, 1130 (C.D. Cal. 2007) ("For fifty years, courts have followed this rather obvious principle and dismissed copyright claims that fail from the face of the complaint (and in light of all matters properly considered on a motion to dismiss)."); *see also* 3 PATRY ON COPYRIGHT § 9:86.50 ("Every court of appeal to have addressed the question has held that in particular cases, a district court can decide a claim of infringement in response to a Rule 12(b)(6) motion to dismiss, including ruling for defendant.").

"To establish [copyright] infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 361 (1991). Not all copying, however, is copyright infringement. "[E]ven if actual copying is proven, the court must decide, by comparing the allegedly infringing work with the original work, whether the copying was unlawful." *Jackson v. Booker*, 465 F. App'x 163, 166 (3d Cir. 2012). This inquiry requires "[t]he one claiming infringement [to] demonstrate that the copying was improper or unlawful by showing that the second work bears substantial similarity to protected expression in the earlier work." *Id.* (*quoting Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998)). It is only where "there is 'substantial' similarity between the alleged infringing work and *protectible* elements of the original work" that there can be "actionable copying." *Dam Things from Denmark v. Russ Berrie & Co., Inc.*, 290 F.3d 548, 562 (3d Cir. 2002) (emphasis added). The test for determining actionable substantial similarity is "whether a 'lay-observer' would believe that the

copying was of protectable aspects of the copyrighted work." *Winstead v. Jackson*, 509 F. App'x 139, 143-45 (3d Cir. 2013). Of import, the type of registration submitted is important to understanding what is protected and how to conduct the infringement analysis.

### 1. The physical robots are different, and the typical robot characteristics identified are not separately protectable.

The Copyright Act defines a three-dimensional sculptural work as limited to the three-dimensional, static exterior of the sculpted object. 17 U.S.C. §§ 101 and 102 (defining "[p]ictorial, graphic, and sculptural works" to "include two-dimensional and three-dimensional works of fine, graphic, and applied art . . . Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned"); *see also* U.S. Copyright Office, Compendium of U.S. Copyright Office Practices ("Compendium") § 504.1 (3d ed. 2017) ("A registration covers the copyrightable authorship that the author or co-authors contributed to the work, but it does not cover any uncopyrightable material that appears in the work. … [A] registration does not extend to uncopyrightable material that appears in a work of authorship … even if it contains ambiguous language that may refer to uncopyrightable material.").

There can be no infringement where, when viewed as a whole, the challenged object looks substantially different from the claimed object. *See Whelan Assocs., Inc. v. Jaslow Dental Lab, Inc.*, 797 F.2d 1222, 1245 (3d Cir. 1986) (holding that one "must make a qualitative, not quantitative, judgment about the character of the work as a whole and the importance of the substantially similar portions of the work."). Here, the "three-dimensional sculptures" are demonstrably different, even after a cursory glance. COZMO and VECTOR robots have cat-track, tank-like structures with an arm-like apparatus mimicking a front loader on the front with a paddock-surround, pad-style charger, whereas the EMO robot is a two-legged humanoid robot without arms, wearing headphones, and has two legs with distinct, boxy, articulating feet standing

on a skateboard charging station.



Consequently, when sculptures as a whole are not similar, dismissal is proper because having specific features in common is not sufficient, as a matter of law, for a finding of copyright infringement.  *See, e.g.*, *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532, 537-8 (6th Cir. 2020) (upholding denial of preliminary injunction where animal sculpture similarities were found to be inherent in their subjects (animals and ice sculptures) and not substantially similar even though some traits and characteristics were similar); *Wolstenholme v. Hirst*, 271 F. Supp.3d 625, 638-39 (S.D.N.Y. 2017).

Recognizing that the EMO robot is not substantially similar to either the VECTOR robot or the COZMO robot, DDL attempts to point to specific narrow traits of the robots, such as the shape of the head/face and the eye designs (which are not even sculptural, but are changing, fluid graphic elements) to suggest that such similarities are sufficient to establish infringement of the overall structural works.  Such an attempted reading is improper for a variety of reasons.  First, the Copyright Act explicitly excludes from copyrightability certain categories of traits, providing that "[i]n no case does copyright protection for an original work of authorship extend to any ***idea,*** procedure, process, system, ***method of operation, concept,*** principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."  17 U.S.C.

§102(b) (emphasis added).  Accordingly, the idea, concept, or method of operation of a toy robot, and any "elements of expression that naturally follow from the idea of such a sculpture" are also not protectable.  *Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir. 2003).  Here, toy robots can be expected to have heads, faces and eyes, and even a cursory review of how such robots are typically portrayed reveal that square-ish heads, screen faces, and glowing square eyes are commonplace. *See Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901-02 (9th Cir. 1987) ("No copyright protection may be afforded to the idea of producing stuffed dinosaur toys or to elements of expression that necessarily follow from the idea of such dolls" such as postures or body designs, open mouths (since Tyrannosaurus is commonly pictured with its mouth open), or "the fact that both lines of dinosaurs are gentle and cuddly, given that stuffed animals are intended for children and are usually designed to be soft and nonthreatening.").  DDL cannot claim exclusive rights to the idea or concept of a sculpture that happens to have elements that are expected of such a robot figure.  *See Enchant*, 958 F.3d at 539 (recognizing that substantial similarity cannot be based on similarities identified that are inherent to the subject matter depicted).

Moreover, reviewing the sculptural shape of the heads and faces proves they are not similar. The SAC only show DDL's VECTOR and COZMO robots.  Comparison of the head and face screen shape with the EMO robot demonstrates material differences thereby negating any sculptural infringement claim, even if it was proper to compare the head and screen shape alone:







**2. The copyright registrations do not protect individual animations or graphics combined with sounds.**

Turning to the other aspects of the robots that are accused of copyright infringement, as noted in Section 504.1 of the Compendium, mechanical or utilitarian features of a sculpture are not protected by the Copyright Act.  Accordingly, DDL's registration for a three dimensional sculpture does not cover, and DDL cannot claim copyright protection for, any of the alleged movements that the robots make as such mechanical movements are not within the scope of the registration.  DDL conceded this point in the SAC, and eliminated "choreography" from its claim which it now limits to "images, animations and expressions in the graphics of the face and eyes of, each robot…". (SAC

¶¶ 23 and 24).

DDL improperly tries to single out specific sounds, animations and graphics as snippets from the videos, even though copyright protection is limited to the entirety of the fixed audiovisual presentation, itself.  (*See* FAC ¶¶ 47, 50, 51, 52, 61).  Here, DDL registered two videos.  An audiovisual work as defined by the Copyright Act is limited to "a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors, viewers, or electronic equipment."  17 U.S.C. § 101.  An "audiovisual work" does not include the actual robot that is depicted in the video, as the robot itself is not "a series of related images," and is not shown "by the use of machines or devices."  Moreover, contrary to DDL's arguments, the registered videos are not shown on the screen of the EMO robot face, and are not replayed in the way it is depicted in the registration.  Thus, DDL's attempt to suggest it can capture the graphics, animations and sounds that are triggered by various external stimuli in the copyright registration as submitted as an audiovisual work is unsupported by the case law.

In an attempt to justify its clear extension of the reach and interpretation of an audiovisual copyright registration and thereby salvage its copyright infringement claim, DDL turned to two cases involving allegations of copyright infringement brought by the manufacturer of Teddy Ruxpin teddy bears.  *See Worlds of Wonder v. Vector Intercontinental, Inc*., 653 F. Supp. 135 (N.D. Ohio 1986); *Worlds of Wonder, Inc. v. Veritel Learning Sys., Inc*., 658 F. Supp. 351 (N.D. Tex. 1986).  DDL cited these cases in an effort to suggest that DDL's interpretation of the breadth of its own audiovisual copyright registrations is accurate in its Motion to Amend its First Amended Complaint.  DDL's reliance on these cases is misplaced, and does not support its interpretation of its Audiovisual Copyrights.   In these cases, Worlds of Wonder filed suit against two separate entities who made cassette tapes that, when played in the Teddy Ruxpin teddy bears' integral tape players,

would send commands to the teddy bears to animate the teddy bears, in addition to playing the story sound recordings intended to be heard by the listeners.  These accused tapes were not authorized by the manufacturer of Teddy Ruxpin teddy bears, but could be used to control and manipulate the teddy bears because they provided the underlying control cues in the tape recordings to trigger the functionalities of the bears (*e.g*., movement, blinking, mouth movement, etc.).

First, the factual situation is entirely different.  In the Teddy Ruxpin cases, Worlds of Wonder did not want defendants manufacturing and selling audio tapes that caused its actual teddy bears to move and function according to instructions provided on those tapes.  Here, we are talking about separate robots entirely.  DDL has its own robots, and Living.AI manufactures an entirely separate and different robot.  DDL must prove copying of the audiovisual work to assert infringement, and in no way is Living.AI accused of controlling DDL's robots.  Moreover, DDL is explicitly focused on graphic and animated content by its own admission, and not physical movement or choreography.  If these cases are truly applicable, then it appears DDL is arguing graphic and animated content is akin to movement or choreography, and DDL has already stated it is not claiming movement and choreography as infringing content in the SAC.

Beyond the fact that these cases are simply not instructive in the analysis because they pertain to a very unique factual situation of the production and sale of an unauthorized audio tape capable of controlling the movements of a party's teddy bears, it should be noted that these 1986 decisions are roundly criticized in extreme terms in the canons of copyright law:

> Looking at these decisions critically, they illustrate the negative side of a whole being greater than the sum of its parts. Each mis step in the analysis has a superficial plausibility, but the ***final results render the decisions among the most ludicrously perverse in the history of copyright jurisprudence***.

> At the root of the issue is the classification of Teddy Ruxpin as an audiovisual work. First of all, a moving toy, activated by internal motors, does not satisfy the definition of an audiovisual work as it is not composed of a series of distinct images; it is a

three-dimensional object that actually moves, quite a different creature than an audiovisual work. ***Indeed, if a toy moved by an internal motor is an audiovisual work there is no rational limit to what is an audiovisual work***.

Abrams & Ochoa, 1 The Law of Copyright § 2.43.50 (emphasis added; attached hereto as Exhibit 2). *See also* 4 Patry on Copyright § 12.20 (describing the Teddy Ruxpin cases as the "most egregious decisions involving a three-dimensional work") (attached hereto as Exhibit 3).

It is clear that a moving toy does not satisfy the definition of an audiovisual work. However, that is precisely what DDL wants to protect. The deposit materials for these registrations are actually videos of the specific choreography and movements of DDL's robots, though some of those movements appear on the screen faces of the robots, in addition to mechanical movements of the robots. DDL cannot argue that the copyright deposit material videos, themselves, are the audiovisual works because those videos are clearly not copied by Living.AI. All DDL can argue is that it should be permitted to excise isolated seconds of sound and display graphics and animations that appear on the faces of the robots in responding to different commands and in taking different actions, and argue that Living.AI's robot makes similar (but not identical) sounds, and displays similar (but not identical) graphics. DDL's argument is that in those few seconds, copyright infringement occurs. That simply is not what audiovisual registrations protect.

These types of items are not copyrightable as they are functional characteristics of a robot that are arguably somewhat similar because of the activity being performed (*e.g*., a greeting, an alarm, a weather report, etc.). It is beyond dispute that functional characteristics are not copyrightable. *See, e.g*., *Great Am. Fun Corp. v. Hosung N.Y. Trading, Inc*., 960 F. Supp. 815, 819 (S.D.N.Y. 1997) ("The weighting, flexibility and extended length of the marionettes' legs and feet, which enable the puppets to 'walk,' and the positioning of strings enabling the puppeteer to control the walk are driven by purely functional aims."); *Kurt S. Adler, Inc. v. World Bazaars, Inc*., 897

14

F.Supp. 92, 95 (S.D.N.Y. 1995) (the "functional elements" of a bubble-blowing, Santa-Claus-shaped Christmas tree ornament were "a pivoting arm holding a bubble wand, which arm is capable of dipping the wand into a reservoir of bubble fluid and bringing the wand to a round hole in Santa's mouth.").  Where functions are performed (or indeed the alleged infringing item constitutes stock gestures), they are not subject to copyright protection.

Moreover, as the Copyright Office has explained in the case of "motion pictures, including video recordings," "[c]opyright does not cover the idea or concept behind a work or any characters portrayed in it." *See* Copyright Office Circular 45, available at https://www.copyright.gov/circs/circ45.pdf.  DDL cannot claim copyright protection for the actual COZMO robot or VECTOR robot beyond the static appearance of the robot covered by the 3-D sculpture claim discussed above; thus, there is no valid claim in any graphic, animation or sound that can be asserted based on the video deposit materials and the various noises that the EMO robot emits beyond comparing the actual video deposits, in their entireties, to allegedly infringing videos. The SAC does not do that because there is no Living.AI video that would even arguably infringe the actual video deposits.

Additionally, just as an idea cannot be claimed in the sculptural context, so, too, stock movements and gestures are not subject to copyright protection  The U.S. Copyright Office's Compendium explicitly states that actions or "[p]antomimes performed by animals, **robots**, **machines**, or any other **animate** **or** **inanimate** object are not copyrightable and cannot be registered with the U.S. Copyright Office", and that "stock **gestures**, common techniques, ordinary motor activities, and other uncopyrightable movements cannot be registered as separate and distinct works of authorship, even if they contain a substantial amount of creative expression." (Compendium §§ 806.4(C) Human Performance Required) (emphasis added), 806.4(D)).  As the Third Circuit has

confirmed, "expressions that are standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting are not protectable under copyright law." *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 214 (3d Cir. 2002) *quoting Gates Rubber Co. v. Bando Chem. Indus., Ltd*., 9 F.3d 823, 838 (10th Cir. 1993). None of the identified animations referenced in the SAC are copyrightable because they are standard or stock expressions. *See* Exhibit 4 to Motion (providing links to clips referenced in the charts set forth in paragraphs 50 and 61 of the SAC for comparison to demonstrate they are stock gestures, and moreover, are not even the same gestures).

For example, an alarm clock sound, a weather report depicting rain in response to a question about the weather, or an exclamation of surprise are stock and standard gestures, and even if the EMO robot's gestures were substantially similar to the COZMO robot and/or the VECTOR robot (which they are not), they would still not be considered protected material. *See* Exhibit 4 (providing links to the enumerated clips in paragraphs 50 and 61 of the SAC for comparison). Granting copyright protection to the necessary incidents of an idea would effectively afford a monopoly to the first programmer to express those ideas. *Whelan Assocs.*, 797 F.2d at 1236–37; *Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485, 489 (9th Cir. 1984). Such a monopoly is expressly not available under copyright law. No one may own a monopoly over the idea of using bells to depict a wake-up alarm, or raindrops to depict rain. The idea of an "emotive" desktop toy robot that can operate as an alarm clock and provide a weather report, is simply not copyrightable. *See also Daniels v. Walt Disney Co.*, 958 F.3d 767, 772 (9th Cir. 2020) (affirming the dismissal of copyright claim alleging rights in characters consisting of color-coded anthropomorphic emotions, noting "[C]olors themselves are not generally copyrightable… Nor is the 'idea' of an emotion

copyrightable.  Taken together, these principles mean that [plaintiff] cannot copyright the idea of colors or emotions.") (internal citations omitted).

### 3.  The sounds cannot be divorced from the videos, and, in any event, they are not the same nor were they copied.

Finally, none of the sounds in the videos are legally "substantially similar" to the EMO robot's sounds.  To infringe a sound copyright, an accused sound must be a copy of the "actual sounds" and not just sounds that "imitate" or "simulate" those in the sound recording.  17 U.S.C. § 114(b).

> The exclusive right of the owner of copyright in a sound recording under clause (1) of section 106 [the right "to reproduce the copyrighted work in copies or phonorecords"] is limited to the right to duplicate the sound recording in the form or phonorecords or copies that directly or indirectly recapture ***the actual sounds*** fixed in the recording.  The exclusive right of the owner of copyright in a sound recording under clause (2) of section 106 [the right "to prepare derivative works based upon the copyrighted work"] is limited to the right to prepare a derivative work in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality.

*Id.* (emphasis added).  The exclusive rights of the owner of a copyright in a sound recording under clauses (1) and (2) of section 106 do not extend to the making or duplication of another sound recording that consists entirely of an independent fixation of other sounds even though such sounds imitate or simulate those in the copyrighted sound recordings.  There are no facts pled to suggest actual copying has occurred; moreover, reviewing Exhibit 4 demonstrates that these sounds are not the same, which further requires rejection of the infringement claims premised only on sound.

Beyond the fact that the sounds are not the same, "when registering a claim in the soundtrack for an audiovisual work, the applicant should state 'sounds,' 'soundtrack', or 'sounds accompanying an audiovisual work' in the application."  Compendium 807.2(B).  DDL did not claim sound, and thus has no separate rights in the soundtrack to its videos, and cannot claim infringement based only on review of a sound divorced from the other registered elements of the

audiovisual work, including the choreography (which it already did try to explicitly exclude from consideration). *Phoenix Entertainment Partners, LLC v. Dr FOFO, LLC*, No. 2:17-cv-03327-DNC, 2018 WL 4635988 at *4-5 (D.S.C. Sept. 27, 2018) (explaining importance of Copyright Office registration categorizations and dismissing claim on motion to dismiss because incorrect registration form precluded finding valid copyright registration). In short, DDL cannot try to re-characterize its registrations to try to increase the likelihood of finding infringement.

In sum, the copyright registrations do not protect discrete physical aspects commonly included in robots, stock gestures, mechanical movements, utilitarian features, functionality, or non-identical sounds, and there is no allegation that the registered videos are substantially similar to any video advertising the EMO robot. Thus, the EMO robot, as a matter of law, does not infringe the asserted audiovisual copyright registrations. Looking at the submitted deposit materials as the works against which infringement is judged, as required by law, clearly demonstrates that the copyright registrations are not infringed.

## B. Factual reference to VECTOR robot's compatibility to EMO robot is fair use, not trademark infringement.

Count II of the Second Amended Complaint is styled as "trademark infringement". The Second Amended Complaint identifies two federal trademark registrations: one for the VECTOR wordmark (U.S. Reg. No. 5,711,131), and one for the yellow, stylized COZMO wordmark (U.S. Reg. No. 5,842,149). (*See* SAC at ¶ 20, and Exs. A and B). However, it ***appears*** that only the VECTOR wordmark is the basis for the trademark infringement claim set forth at Count II.[4] (*See* SAC at ¶¶ 1, 109, 113-122 and 124). Living.AI uses the word "appears" because DDL's

---

[4] Claims of trade dress infringement are separately asserted in Count III of the Complaint, and will be addressed in response to that Count, even though trade dress infringement is considered a variety of trademark infringement.

allegations seem to incorrectly suggest that it has some undefined trademark right in the entire appearance of its robot that it sells under the VECTOR® mark. (*See* SAC at ¶ 110).  To be clear, DDL does not have any trademark registration for the VECTOR robot's appearance, and this count only pertains to use of the word "vector" and whether there is any infringement as a result of such use under Sections 1114 and 1125 of the Lanham Act.

To establish a claim of trademark infringement, DDL must allege facts that, if true, would plausibly lead to the conclusion that (1) the mark is protectable; (2) that it owns the mark; and (3) that Living.AI's alleged use of the mark is likely to cause confusion.  *Pellegrino v. Epic Games, Inc.*, 451 F. Supp.3d 373, 389 n.8 (E.D. Pa. 2020) (*citing Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994)).  However, DDL fails to plead any factual matter that would give rise to a claim that Living.AI's use of VECTOR is anything other than permissible fair use.

Living.AI's advertisements and social media posts indicate that Living.AI's EMO robot is compatible with DDL's VECTOR robot, but uses the non-formal language that the robots "are friends".  As DDL is well aware from its own public advertisements and comments, use of the trademarks associated with third party devices is common when discussing compatibility.  (*See, e.g.*, SAC ¶ 2 (commenting on DDL's robots' compatibility with Amazon's ALEXA), and Exhibit 5 to Motion (DDL's own listing of third party compatible devices it identifies on its website)).

These types of factual statements do not create any likelihood of confusion and do not constitute infringement; rather, these statements are conveying factual information that is permitted as a matter of law under the doctrine of fair use.  Nominative fair use occurs when use of the trademark is the only practical way to refer to something.  *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 228 (3d Cir. 2005); *see also Keurig, Inc. v. Strum Foods, Inc.*, 769 F. Supp.2d 699, 708-710 (D. Del. 2011) (recognizing that use of trademark relating to coffee system

on unrelated company's coffee pods to indicate compatibility with the system was likely to be successful fair use defense against trademark infringement claim in denying injunction motion). Here, the only allegations in the Second Amended Complaint demonstrate Living.AI is communicating that the EMO robot can communicate with the VECTOR robot, and the "alleged confusion" consists of questions from the public regarding that compatibility.   Trademark infringement is not dependent on an allegation of actual confusion; rather, the question is one of *likelihood* to cause confusion.  *Pellegrino*, 451 F. Supp.3d 373, 389 n.8 (E.D. Pa. 2020) (emphasis added).  DDL does not allege any factual support to suggest there is any false endorsement or false claim of sponsorship.  As a result, because the only use of the word "vector" is conveying factual information regarding device compatibility and to refer to a product by its name, there is no basis to allege trademark infringement of DDL's federal trademark registration for VECTOR in association with toy robots and humanoid robots, as identified in the registration certificate.

C.   **Trade dress must be specifically identified, non-functional and source-identifying.  The Second Amended Complaint fails on all of these requirements.**

To state a claim for trade dress infringement, a plaintiff must first identify the trade dress, and then allege in its complaint that the asserted trade dress is (1) nonfunctional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) ordinarily prudent consumers are likely to be confused about the source of the products.  *Am. Beverage Corp. v. Diageo N. Am.*, Inc., 936 F. Supp.2d 555, 595 (W.D. Pa. 2013) (*citing McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3d Cir. 2007)).  "[I]t is the plaintiff's duty to 'articulat[e] the *specific* elements which comprise its distinct dress.'"  *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 309 (3d Cir. 2014) (emphasis added); citing *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997); *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 768 (6th Cir. 2005) ("To recover for trade-dress infringement under § 43(a) of the Lanham Act, a party must first

identify what particular elements or attributes comprise the protectable trade dress.").  Only after specifically defining the trade dress "can the court and the parties coherently define exactly what the trade dress consists of and determine whether the trade dress is valid and if what the accused is doing is an infringement."  *Treat, Inc. v. Dessert Beauty*, No. 05-923 PK, 2006 WL 2812770, at *14 (D. Or. May 5, 2006) (citation omitted).  The SAC continues to use phrases and words that demonstrate it has not specifically identified the trade dress.  For example, paragraph 68 continues to reference what the trade dress "includes", and uses terms that do not allow for precise definition like "such as".  *See also* Dkt 27 at ¶ 71 ("As further detail, but without limitation, …").  Even the listing in paragraph 69 is vague and attempts to swallow all aspects of the robots by broadly claiming everything is trade dress.  DDL cannot continue to vaguely refer to aspects of its robots under the broad moniker of "trade dress" without supplying specific and clear definition.  On this basis alone, this cause of action fails.  Use of such unrestricted language fails to adequately and clearly identify the "total appearance" of the product that DDL claims is the trade dress at issue.  *See Autodesk, Inc. v. Dassault Systemes Solidworks Corp.*, No. C 08-04397 WHA, 2008 WL 6742224, at *5 (N.D. Cal. Dec. 18, 2008).

DDL additionally includes the robot cube accessory under their "trade dress infringement" claim.  (SAC ¶¶ 72 and 129).  DDL claims "[e]ach cube is distinctively associated with DDL and each has unique set of three symbols that are recognized by the robots[.]."  (SAC ¶ 72).  It is unclear how the cube, itself, is included as part of the alleged trade dress as the cube does not include all of the alleged elements improperly listed as the alleged trade dress in paragraphs 68 and 69. (SAC ¶¶ 68 and 69).  Therefore, this assertion that the use of DDL's Vector® cube in a promotional video, when such inclusion simply shows a cube in the far background of the video, is untenable.   The cube claim does show, however, that DDL completely misunderstands what trade dress is.  Trade

dress allows for source identification of goods.  It is not a way for DDL to claim protection that it cannot claim on elements under copyright protection.

This non-specific recitation is further problematic because it incorporates clearly functional properties of the robots that, by definition, cannot serve as non-functional trade dress.  Functional features are not entitled to trademark protection.  15 U.S.C. § 1052(e)(5).  A product's feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."  *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982).  *See also Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 81 (3d Cir.1982).  The functionality doctrine serves to prevent trademark owners from inhibiting legitimate competition.  The types of items that are enumerated in the non-exhaustive listing of attributes are classically functional.  Indeed, DDL even uses the word "utility" when it is discussing the audio sounds, graphics, and animations that it claims are trade dress.  (*See* SAC at ¶¶ 69(d)-(g)).  The other items are discussed in functional terms (*i.e.*, picture-taking, alarm and weather features, etc.).  The cube accessory is described with functional utility as "interactive", "prompts different responses from both VECTOR® and COZMO®", and "act as way-markers in the real world to help … robots in mapping their respective space." (SAC ¶¶ 2 and 72).  Thus, the Second Amended Complaint fails in defining protectable trade dress.

Alternatively, dismissal of the trade dress cause of action is proper as a matter of law because DDL fails to plead the existence of secondary meaning in sufficient detail.  Secondary meaning exists when "the primary significance" of the claimed trade dress is to "identify the source of the product rather than the product itself."  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211-213, 216 (1999) (citation omitted).  Trade dress is classically sorted into two categories - product packaging and product configuration.  *See Duraco Prod., Inc. v. Joy Plastic Enterprises,*

*Ltd.*, 40 F.3d 1431, 1434 (3d Cir. 1994).   In cases of product configuration, like this case, configuration can never be inherently distinctive.  "[N]o designer should have a monopoly on designs regarded by the public as the basic form of a particular item." *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 638 (6th Cir. 2002).  "While most trademarks only create a monopoly in a word, a phrase, or a symbol, granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001) (marks and citation omitted).  Thus, for product configuration, secondary meaning must be pled.  Here, there is no allegation of secondary meaning provided for the toy robots or the cube.  DDL glosses over this requirement and just offers conclusory pleading.  For this separate reason, the trade dress claim must fail.

## V.   <u>CONCLUSION</u>

DDL does have some intellectual property registrations, and various assets that it has acquired, developed and protected.  However, DDL's claims against Living.AI must fail because those protections do not prohibit what Living.AI has done in developing its own toy robot.  DDL is not suffering from the consequences of any infringement; rather, DDL is attempting to use these registrations and vague references to "trade dress" to stop legitimate commerce and competition.  It is Living.AI – and not DDL – who has suffered and is continuing to suffer damages as a result of DDL's predatory use of these registrations and concepts to try to block Living.AI from the U.S. marketplace.  DDL's various takedown notices do not reflect good faith investigation, and this Second Amended Complaint appears to be a further a step in trying to misuse intellectual property registrations, concepts and legal processes to block a competitor from rightfully accessing the consuming public.  For the foregoing reasons, Living.AI respectfully requests that this Court enter an Order dismissing DDL's Second Amended Complaint in its entirety, with prejudice, and

providing such other and further relief as the Court deems just and proper, including without limitation, attorneys' fees and costs.

Respectfully submitted,

**THE WEBB LAW FIRM**

Dated: March 19, 2021

s/ *Cecilia R. Dickson*
Cecilia R. Dickson (PA ID No. 89348)
Kent E. Baldauf, Jr. (PA ID No. 70793)
One Gateway Center
420 Ft. Duquesne Blvd., Suite 1200
Pittsburgh, PA 15222
412.471.8815
412.471.4094 (fax)
cdickson@webblaw.com
kbaldaufjr@webblaw.com

*Attorneys for Defendant Living Technology (Shenzhen) Co., Ltd., d/b/a Living.AI and Emo Pet*

No. 2:20-cv-01500-CCW

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of March, 2021, a copy of this **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT** was filed on the Court's CM/ECF system, which sent notification to all counsel of record.

THE WEBB LAW FIRM

s/ *Cecilia R. Dickson*
Cecilia R. Dickson