IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DIGITAL DREAM LABS, LLC.,

            Plaintiff,

    v.

LIVING TECHNOLOGY (SHENZHEN) CO.,

            Defendant.

2:20-CV-01500-CCW

## MEMORANDUM OPINION

Before the Court is Defendant Living Technology (Shenzhen) Co.'s (doing business as "Living.AI") (hereinafter, "Living.AI") Motion to Dismiss Plaintiff Digital Dream Labs, LLC's ("DDL") Second Amended Complaint.  *See* ECF No. 29.  For the reasons that follow, Living.AI's Motion will be GRANTED in part and DENIED in part.

## I. Background

### A. Procedural History

This is a case about dueling interactive desktop robots.  DDL's Second Amended Complaint contains three counts against Living.AI:  (1) copyright infringement, (2) trademark infringement, and (3) trade dress infringement.  *See generally*, ECF No. 27.  Living.AI filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* ECF No. 29.  This Court has federal question jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, and 1338(a).

**B.**     **The Second Amended Complaint's Factual Allegations**

**1.   DDL's Intellectual Property Assets in VECTOR and COZMO**

According to the Second Amended Complaint, DDL is a technology education company that sells and markets interactive robots, including VECTOR and COZMO.  ECF No. 27 ¶¶ 5, 14. DDL acquired registered patents and trademarks for VECTOR and COZMO in 2019 when it acquired the intellectual property assets of another robotics company, Anki, Inc.  *Id.* ¶¶ 15, 16.  In particular, DDL acquired rights to all trademarks of VECTOR and COZMO.[1]  *Id.* ¶ 20.  During this case, DDL applied for and received two copyright registrations—one for VECTOR and one for COZMO—covering the "three-dimensional sculpture and audiovisual work" of each robot, with an official registration date of November 13, 2020 (together, the "Robot Copyrights[2]").[3]

DDL contends that these two Robot Copyrights—one for COZMO and one for VECTOR— "cover the totality of [each robot's] three-dimensional sculptures and audiovisual works."[4]  DDL describes the three-dimensional sculptural work protected by the Robot Copyrights as being comprised of non-functional elements, including "the distinctive shape, respective sizes, orientations and structure of the head, face, and eyes of each robot."  *Id.* ¶ 24.  DDL describes the

---

[1] U.S. Registered Trademark No. 5,711,131 dated March 26, 2019 (the "VECTOR Trademark").  ECF No. 27-1.  U.S. Registered Trademark No. 5842149, dated August 27, 2019 (the "COZMO Trademark").  ECF No. 27-2.

[2] *See* U.S. Copyright Registration Nos. PA 2-266-064 and PA 2-266-065.  ECF Nos. 27-5 & 27-6.

[3] In September 2020, Digital Dreams was granted two U.S. Copyright Registrations (No. SR 879-604 and No. SRu 1-424-806, together, the "Sound Copyrights")), *see* ECF Nos. 27-3 & 27-4, covering sound recordings of the voice history and voice design of the COZMO robot.  *See* ECF No. 27 ¶ 21.  Digital Dreams contends "the sounds in the … Sound Copyrights are included in the sounds of the … [Robot] Copyrights."    Id. ¶ 24.  The Second Amended Complaint alleges infringement only of the [Robot] Copyrights.  *See* ECF No. 27 ¶¶ 94-105.

[4] Each Robot Copyright registration was filed with a series of video deposits "showing the physical structure of the VECTOR® and COZMO® robots as well as audiovisual works in the nature of the sounds and voices emitted by, as well as images, animations and expressions in the graphics of the face and eyes of, each robot that are activated by a voice command from the user or other preset stimuli."  ECF No. 27 ¶ 23.  However, DDL concedes that these Robot Copyrights do not protect the specific choreography and movements of the robots as a whole.  *Id.* ¶ 24.

audiovisual work protected by the Robot Copyrights as sets of images, graphics, animations, and sounds. *Id.*

### 2. The COZMO, VECTOR, and EMO Robots

COZMO was introduced into the United States market by Anki in 2016, and VECTOR was introduced into the United States market in 2018. *Id.* ¶ 17. Living.AI markets a robotic desk companion named EMO. *Id.* ¶ 6.

On September 1, 2020, DDL became aware that Living.AI was marketing its EMO robot for release in the United States on social media platforms. Some platforms indicated that "VECTOR® and EMO are friends," and Living.AI uploaded a pre-launch marketing video to YouTube, which included a segment where VECTOR is placed next to EMO and EMO reacts. *Id.* ¶¶ 27–28; *see also*, *id.* ¶ 58 (contending on social media that "Emo can recognize Vector and Cozmo and they can be friends!"). DDL asserts that Living.AI created a false association between Living.AI's robot EMO and DDL's robots, by intentionally and knowingly including of segments of various marketing videos substantially similar to those used to promote COZMO to target current DDL customers and misrepresent a direct affiliation between EMO and VECTOR and COZMO. *Id.* ¶¶ 34–35.

On September 18, 2020, DDL's counsel sent a Notice of Infringement of Intellectual Property Rights to Living.AI asserting that the design, animations, graphics, and sound effects of EMO violated DDL's intellectual property rights. *Id.* ¶¶ 31; *see also*, ECF No. 27–9.

DDL has filed several notices and complaints of infringement with social media companies requesting that infringing content be removed, including Living.AI's Indiegogo global launch page and Kickstarter Page, *see* ECF No. 2 ¶¶ 29–30 (listing links that have been removed), ¶¶ 54–56

(describing content and takedown of Indiegogo page), ¶¶ 57, 64–65 (describing content and takedown of Kickstarter page). However, DDL alleges that Living.AI continues to create new social media posts and other Internet-based storefronts with infringing content. *Id.* ¶ 29.

### 3. The COZMO, VECTOR, and EMO Robots

DDL alleges that EMO's head, face, eye designs, sounds, animations, and graphics directly infringe on the Robot Copyrights. *Id.* ¶ 36. In doing so, DDL provides examples comparing EMO's facial animations, graphics and eye shape when EMO shows certain emotions or reacts to humans with the corresponding feature of COZMO and VECTOR. *Id.* ¶ 37 (describing response to question on weather), ¶¶ 47–48 (comparing sounds), ¶ 49 (alleging that Living.AI altered its marketing video to avoid the direct infringement of the Sound Copyrights), ¶ 50 (comparing animations), ¶ 51 (asserting that the sounds are direct copies in a lower tone), ¶ 52 (comparing facial expression graphics), ¶ 61 (comparing animations); *see also*, ECF No. 40-1 (providing updated chart).

### 4. Public Reaction to EMO and Association with DDL

DDL contends that even after Living.AI was notified of infringement, when confronted with questions about the affiliation between VECTOR and EMO, Living.AI has created and promoted a false connection and/or sponsorship by identifying VECTOR and EMO as "friends." *Id.* ¶¶ 32–33. DDL asserts that there are multiple references to "VECTOR[] and EMO are friends" throughout Living.AI's social media accounts, and the YouTube video directly infringed on the VECTOR Trademark. *Id.* ¶ 33.

Further, DDL highlights several social media posts and video responses from individuals, including technology reviewers, that have commented on the similarities between VECTOR,

COZMO, and EMO, *id.* ¶ 66, assumed that EMO was an updated version of VECTOR and COZMO, *id.* ¶ 38, or otherwise attributed EMO to DDL, *id.* ¶¶ 44, 66. *See also*, *id.* ¶¶ 83–93; ECF No. 27-12 (social media posts).

DDL contends that it suffered a "severe decline" in sales before and after the EMO Kickstarter launch and the search term "EMO" is now one of the top ten most searched terms on the DDL website. *Id.* ¶¶ 83, 89.

Following the removal of Living.AI's Indigogo and Kickstarter pages, DDL discovered that EMO was being advertised on third party sites for the "bargain basement price" of $19.99, and that Living.AI continued to seek other avenues to begin selling EMO in the United States.[5] ECF No. 27 ¶¶ 84–85.  At the time of the Second Amended Complaint, Living.AI's website at https://www.living.ai offered EMO for sale directly, at a price which DDL notes seemed to fluctuate between $229.00 and $169.99. *Id.* ¶ 88.  Further, DDL alleges that Living.AI has used the email list of Kickstarter users who originally pledged to solicit sales directly from potential customers by directing them to reorder EMO directly through their website (https://www.living.ai). *Id.* ¶¶ 87–88.

### 5.  Trade Dress

Finally, because DDL also brings a claim of trade dress infringement, the Second Amended Complaint sets out what DDL considers to be VECTOR's and COZMO's distinctive trade dress. The Court will address the specifics of the trade dress claim Section III.C below but briefly highlights the Second Amended Complaint's content here.  DDL asserts that the trade dress, "both

---

[5] Following an inquiry from the Court regarding EMO's availability for purchase and distribution, the parties stated that "US customers can order the EMO robot from the website, though there is no physical US-based distributor or subsidiary. There is no clear delivery time set forth on the website for newly submitted orders."  ECF Nos. 39 & 40.

individually for certain components and collectively" comprises (i) non-functional design elements of the robots, such as the shape, respective size, orientation and design of the robot heads, face and eyes, (ii) sounds/voices, (iii) facial and eye images, graphics and animations, (iv) robot motions, and (v) the design of robot cube accessories." *Id.* ¶¶ 68, 69, 71 (noting that "[a]s further detail, but without limitation, examples of a portion of the various facial and eye images, graphics, and animations included in the VECTOR® and COZMO® trade dress are shown in the deposits for the [] [Robot] Copyrights"), 77 (characterizing such distinctive features as non-functional). DDL also contends that the COZMO and VECTOR robots' cube accessories are "distinctively associated with DDL and each has [a] unique set of three symbols that are recognized by the robots and thereby provide direction," and have been featured in EMO promotional videos. *Id.* ¶¶ 72–74. DDL alleges that EMO "is [a] confusing and substantially similar imitation of both VECTOR and COZMO's trade dress," which "has caused and is likely to cause confusion, deception, and mistake by falsely associating Living.AI's EMO robot with DDL." *See id.* ¶¶ 79–82.

## II.    Standard of Review

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a claim. In reviewing a motion to dismiss, the court accepts as true a complaint's factual allegations and views them in the light most favorable to the plaintiff. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d. Cir. 2008). Although a complaint need not contain detailed factual allegations to survive a motion to dismiss, it cannot rest on mere labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is, "a formulaic recitation of the elements of a cause of action will not do." *Id.* Accordingly, "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and be "sufficient … to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "The plausibility

standard is not akin to a 'probability requirement,' but it asks for more than the sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

The United States Court of Appeals for the Third Circuit has established a three-step process for district courts to follow in analyzing a Rule 12(b)(6) motion:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).  That said, under Rule 8's notice pleading standard, even after the Supreme Court's decisions in *Twombly* and *Iqbal*, a plaintiff need only "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Connolly v. Lane Constr. Corp.*, 809 F.3d 780, 788–89 (3d Cir. 2016) (finding that "at least for purposes of pleading sufficiency, a complaint need not establish a prima facie case in order to survive a motion to dismiss").

On the other hand, "[t]o prevail on a Rule 12(b)(6) motion to dismiss based on an affirmative defense…a defendant must show that 'the defense is "apparent on the face of the complaint" and documents relied on in the complaint.'"  *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 130 (3d Cir. 2018) (quoting *Bohus v. Restaurant.com, Inc.*, 784 F.3d 918, 923 n.2 (3d Cir. 2015)).

### III.     Discussion

#### A.     Living.AI's Motion to Dismiss the Copyright Infringement Claim Will Be Granted in Part and Denied in Part

##### 1.     Each Robot Copyright Contains Two Copyrightable Works

As a preliminary matter, in considering DDL's copyright infringement claim, the Court must first determine which works are at issue.  In this regard, the Robot Copyrights present an interesting feature—they cover "three-dimensional sculpture and audiovisual work," which the Copyright Act treats as two different types of works of authorship.  *See* 17 U.S.C. § 102(a)(5)–(6) (extending copyright protection to sculptural works and audiovisual works);  *see* 37 CFR § 202.3(b)(1)(ii) (listing audiovisual works), (iii) (including sculptural works).

"Sculptural works" include "three-dimensional works of fine, graphic, and applied art" and include "works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned."  17 U.S. Code § 101.  "Audiovisual works" are defined as "works that consist of a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied."  *Id.*

DDL's brief in opposition to Living.AI's Motion referred to a singular three-dimensional sculpture and audiovisual work, which "consists of the 'the shape of the sculpture as well as the audiovisual work as a whole, which includes the series of images displayed on the screen and the accompanying sounds.'"  *see* ECF No. 34 at 6–7.  Consequently, the Court ordered the parties to address how many works should be considered in a substantial similarity analysis of the Robot Copyrights.  ECF Nos. 41 & 53.

During oral argument, the parties agreed that each of the Robot Copyrights contained two works—a three-dimensional sculpture <u>and</u> an audiovisual work. *See* ECF No. 53 at 5:23–6:26 ("for the purpose of our motion to dismiss, we believe is okay just to treat them as two separate works), 8:10–13, 8:18–22, 16:5–12 ("Each [of the two separate registrations] gives rise to two separate works, the sculptural work, as well as the AV work."), 23:6–9, 24:23–24. The parties then outlined the copyrightable features of each work separately. Thus, after setting out the applicable law about copyright infringement, the Court will analyze the three-dimensional sculpture works and audiovisual works separately for the purpose of this Motion to Dismiss.

## 2. Elements of Copyright Infringement

"To establish a claim of copyright infringement, a plaintiff must show: '(1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work.'" *Tanksley v. Daniels*, 902 F.3d 165, 172–73 (3d Cir. 2018) (citing *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002)).

The second element in a copyright infringement claim—unauthorized copying—"itself comprises two (frequently conflated) components: [1] actual copying and [2] material appropriation of the copyrighted work." *Tanksley*, 902 F.3d at 132 (citing *Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998)). Both components are required because "not all instances of actual copying give rise to liability, and, conversely, without proof of actual copying the amount of similarity between two works is immaterial." *Tanksley*, 902 F.3d at 173. With respect to the second component, material appropriation of the copyrighted work occurs when "there is 'substantial' similarity[6] between the alleged infringing work and protectible

---

[6] The term "substantial similarity" is often used when discussing both actual copying and material appropriation, however "[t]here is a critical, though often misunderstood, distinction between" the two concepts. *Tanksley*, 902 F.3d

elements of the original work." *Dam Things from Denmark v. Russ Berrie & Co., Inc.*, 290 F.3d 548, 562 (3d Cir. 2002) (emphasis added).

Living.AI's Motion to Dismiss focuses only on the material appropriation of the copyrighted work—whether there is substantial similarity in the protectable aspects of the alleged copyrighted work. *See* ECF No. 30 at 6–18.

### 3.  Determinations of Substantial Similarity in the Context of Rule 12(b)(6)

Although substantial similarity "is usually an extremely close question of fact" that is typically reserved for the jury, the Court of the Appeals for the Third Circuit, along with other Courts of Appeals, have recently affirmed dismissals under Rule 12(b)(6) which include a finding that there was no substantial similarity as a matter of law. *Tanksley*, 902 F.3d at 171;  *see also* 3 William F. Patry, Patry on Copyright § 9:86.50 (Sept. 2021)) (noting that "[e]very court of appeal to have addressed the question has held that in particular cases, a district court can decide a claim of infringement in response to a Rule 12(b)(6) motion to dismiss, including ruling for defendant"). A district court may consider "substantial similarity at the pleading stage," because "no discovery or fact-finding is typically necessary, because what is required is only a visual comparison of the works." *Tanksley*, 902 F.3d at 172 (internal citations and quotations omitted).

The Third Circuit has outlined how district courts should evaluate whether a copyright infringement claim is susceptible to dismissal at the Rule 12 stage. *Id.*  First, district courts "are not limited to the four corners of the complaint, but may also consider evidence integral to or

---

at 173.  "Two works can be 'substantially similar' so as to support an inference of [actual] copying, yet not 'substantially similar' in the sense that the later work materially appropriates the copyrighted work." *Id.*  Here, only the concept of substantial similarity in the context of material appropriation is at issue.

explicitly relied upon therein." *Id.* (internal citations and quotations omitted). As such, "[t]he copyrighted, and allegedly infringing works will necessarily be integral to an infringement complaint and are therefore properly considered under Rule 12(b)(6)." *Id.* When doing a visual comparison of the works, "courts will dismiss an infringement action if they conclude that 'no trier of fact could rationally determine the two [works] to be substantially similar.'" *Id.* (citing 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.10[B][3] (rev. ed. 2018)).

For the purposes of Living.AI's Motion, in addition to reviewing pictorial and video comparisons of the VECTOR, COZMO, and EMO robots referenced in the Second Amended Complaint, the parties conducted a live demonstration of the VECTOR, COZMO, and EMO robots for the Court on January 25, 2022.[7] Both parties agreed that a live demonstration would be appropriate for the Court to consider at this stage as part of an analysis of substantial similarity. ECF No. 40 ¶ 2;  ECF No. 46 ¶ 4;  ECF No. 48 ¶ 2;  ECF No. 51;  *see also Tanksley v. Daniels*, 259 F. Supp. 3d 271, 277 n.1 (E.D. Pa. 2017) (considering the DVDs of television series at issue); *Tanikumi v. Walt Disney Co.*, 616 F. App'x 515, 518 (3d Cir. 2015) (finding that a comparison of the book and motion picture at issue was appropriate); *Winstead v. Jackson*, 509 F. App'x 139, 142 (3d Cir. 2013) ("we have been provided with copies of both [the] book and [the] album/CD and film [at issue].")

### 4.  Substantial Similarity of Protectable Elements

In determining substantial similarity, the court looks at how the copyrighted, and allegedly infringing works "would appear to a [lay-observer] viewing [them] side by side" and whether a

---

[7] In considering the present Motion, the Court reviewed and considered the links and charts provided in the Second Amended Complaint, ECF No. 27 ¶¶ 47, 50, 61;  the videos submitted with the Second Amended Complaint, *see id.* ¶ 23 n.1, ECF Nos. 27-7 & 27-8;  the updated videos and chart of the EMO robot (as opposed to a hyperlink to a website) submitted following this Court's order, *see* ECF No. 39 (ordering submission of copies of EMO videos rather than hyperlinks), ECF No. 40-1 (providing updated chart);  and the Court's own observations during the live demonstration. ECF Nos. 51 & 53. For brevity, the Court will refer to its review of the foregoing as the "Observations" in this opinion.

"lay-observer would believe that the copying was of protectible aspects of the copyrighted work." *Tanksley*, 902 F.3d at 174 (internal citations omitted). To do so, the "trier of fact performs a side-by-side comparison of the works and, excluding any unprotectable elements, assesses whether the two works are substantially similar." *Id.* (citing *Dam Things from Den.*, 290 F.3d at 566).

This analysis is difficult due to the "impossibility of drawing an exact line between what constitutes an idea—which is not protected—and an expression—which is." *Tanksley*, 902 F.3d at 174 (noting that "it is difficult to draw a principled line to determine at what level of abstraction the expression [in the copyrighted work] loses its protection and becomes a mere idea."). Further, the district court must "maintain focus on the protected elements of [copyrighted] work, not the prominence of any such elements in the defendant's work." *Id.*

In analyzing works that contain "a mix of protected and unprotected elements," the first step "is to identify and exclude from the substantial similarity analysis any unprotected material." *Id.* at 175. Then, after excising all unprotectable ideas, courts compare the protectable components. *Id*.

The Third Circuit has warned that the district courts must take into account a work's "total concept and feel," and not "lose sight of material similarities by balkanizing a unified copyrighted work into constituent elements, which are then compared in isolation." *Tanksley*, 902 F.3d at 175 (internal citations and quotations omitted). The commonsense "total concept and feel approach recognizes that a work may be copyrightable even though it is entirely a compilation of unprotectable elements, because what is protectable is the author's original contributions—the original way in which the author has selected, coordinated, and arranged the elements of his or her work." *Id.* (internal citations and quotation); *Peter F. Gaito Architecture, LLC v. Simone Development Corp.*, 602 F.3d 57, 66 (2d Cir. 2010) ("Without meticulously dissecting the works,

a court's task is to compare the works' 'total concept and overall feel . . . as instructed [by] good eyes and common sense.'").

In light of the "obvious tension between the imperative to filter out unprotectable elements of a work while keeping sight of the work's total concept and feel (which necessarily includes unprotectable elements)," the Court "reconcile[s] these competing considerations by recalling that the basic inquiry remains whether an ordinary observer would perceive that the defendant has copied protected elements of the plaintiff's work." *Id.*

After conducting the substantial similarity analysis directed by the Third Circuit, including viewing the robots side-by-side, filtering out the unprotectable elements, and employing "good eyes and common sense," the Court finds that the protectable aspects of the three-dimensional sculptural work of COZMO and VECTOR are not substantially similar to EMO;  however, a rational lay person could find the protectable aspects of the audiovisual work of COZMO's and VECTOR's face to be substantially similar. *Tanksley*, 902 F.3d at 174.  Thus, Living.AI's Motion to Dismiss will be granted in part, such that DDL's copyright infringement claim regarding the three-dimensional sculptural works of VECTOR and COZMO will be dismissed, and denied in part, such that DDL's copyright infringement regarding the audiovisual work of VECTOR and COZMO's faces will not be dismissed.

### 5.   The Three-Dimensional Sculpture of the Robots

Focusing solely on the three-dimensional sculpture of the robots, and not the audiovisual work of VECTOR and COZMO's faces, the Court first determines what portions of VECTOR and COZMO are unprotectable as ideas.  First, a humanoid robot capable of expressing human-like emotions and interacting with the world is unprotectable as an idea.  In addition, a small robot that fits readily on a table as a desktop companion or desktop pet is also unprotectable as idea.

13

However, as discussed below, the sculptural features of VECTOR and COZMO are particularized expressions of the concept of a desktop robot which are entitled to protection—and such protectable elements include the combination and arrangement of elements including the robot's size, appendages, accessories, camera location, and shape.

For three-dimensional sculptures, courts "do not analyze each feature in isolation;  instead, a 'specific *combination* of elements' that gives a sculpture 'its unique look' [can] be eligible for copyright protection."  *Silvertop Assocs. v. Kangaroo Mfg.*, 931 F.3d 215, 220 (3d Cir. 2019) (citing *Kay Berry*, 421 F.3d at 207, 209 (emphasis added) ("[I]t 'means nothing that these elements [such as, texture, color, size, and shape] may not be individually entitled to protection.'")).  In considering three-dimensional sculptures, courts examine the combination of the sculpture's artistic features such as the texture, materials, colors, lines, shape, and size.  *See Silvertop Assocs*, 931 F.3d, at 220–23 (finding that a "banana costume's combination of colors, lines, shape, and length (i.e., its artistic features)" are copyrightable);  see *also Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1012 (2017) (analyzing a cheerleading uniform's "arrangement of colors, shapes, stripes, and chevrons" together, not individually);  *Dellamorte, LLC v. Michaels Cos.*, Civil Action No. 21-cv-2029, 2022 U.S. Dist. LEXIS 14887, at *11–13 (D.N.J. Jan. 27, 2022) (considering the color, size, etchings, and placement of bat and moon graphic on a mug and vase).

Here, the Court when comparing VECTOR and COZMO with EMO side-by-side, the Court finds that a lay person could not believe that the copying was of protectable aspects of the copyrighted three-dimensional sculptural work.  *Tanksley*, 902 F.3d at 172, 174.

The Second Amended Complaint provides the following pictures of VECTOR, COZMO, and EMO:



**VECTOR**                **COZMO**                **EMO**



**VECTOR next to EMO**

ECF No. 27 ¶¶ 5–6, 28

The most distinguishing feature is the shape of VECTOR and COZMO versus the shape of EMO.  First, EMO is about twice as tall as VECTOR and COZMO.  *Id.* ¶ 28 (placing EMO and VECTOR side-by-side in a marketing video);  *see also* ECF No. 29-1 (side-by-side comparison).  Further, the appendages of the robots differ significantly.  VECTOR and COZMO each have two sets of tractor treads, whereas EMO has two leg-like appendages with cube-like feet.  ECF No. 27 ¶¶ 5–6.  Further, EMO has no arm-like appendages, whereas both VECTOR and COZMO have forklift-like arms that join together in the front and extend from the front of their tractor treads to

behind their heads. *Id.* Overall, EMO has a cuboid head balanced on two thin legs, whereas VECTOR and COZMO have a wide base and forklift-like arms that surround the cuboid head. *Id.* ¶¶ 5–6, 28.

DDL contends that the Court should focus on the robots' heads, because when Living.AI first introduced EMO to the world, it did so by showing just EMO's face in a video. ECF No. 53 at 15:24–16:4; 18:2–21 ("Here, the focus of the interaction between the user and these robots is that face and the head."), 33:8–9. According to DDL, because the head is central to the user's interaction with the robots, a qualitative comparison leads to a result of substantial similarity. ECF No. 53 at 12:19–21 ("[T]here is a substantial similarity that is qualitative, not quantitative.") (citing *Whelan Assocs. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222 (3d Cir. 1986)).

Although DDL is correct that the Third Circuit has guided courts to make "a qualitative, not quantitative, judgment about the character of the work," it must do so with respect to the "work as a whole and the importance of the substantially similar portions of the work." *Whelan Assocs. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222 (3d Cir. 1986); *see also Silvertop Assocs.*, 931 F.3d 215, 202 (3d Cir. 2019).

Here, not only do three-dimensional sculptures of the robots as a whole lead to a finding of no substantial similarity; even if the Court focused only on the robots' heads, which would not be the appropriate scope, the result would not change. While both heads have cuboid-shapes with screens, the VECTOR and COZMO heads are significantly smaller than EMO's head. *Id.* ¶ 28. Further, EMO wears over-the-ear headphones, whereas VECTOR and COZMO do not. *Id.* ¶¶ 5–6; *see also* ECF No. 30 at 10–11. Additionally, the ratio of the screen-to-head differs among the robots. EMO's screen is centered in the middle of the head, contains an outer ring that parallels the outer shape of head, and has a camera indicated by a small half-circle at the top center of its

forehead.  ECF No. 27 ¶¶ 5–6;  *see also* ECF No. 30 at 10–11.  Meanwhile, both VECTOR and

COZMO have screens that appear to extend to the edge of the top and bottom of the head and have

a camera at the bottom part of the face inside a long rectangular bar, resembling an open mouth.

ECF No. 27 ¶¶ 5–6;  *see also* ECF No. 30 at 10–11.

      A review of the robots as pictured in the Second Amended Complaint as well as this Court's

Observations clearly show that there is no substantial similarity between the three-dimensional

sculptures of VECTOR and COZMO, and EMO.  ECF No. 27 ¶¶ 5-6, 28.  As a result, the Court

finds that no reasonable jury could find that the three-dimensional sculptures are substantially

similar.  *See Tanksley*, 902 F.3d at 172.  Therefore, the Court will grant in part Living.AI's Motion

to Dismiss, such that DDL's copyright infringement claim regarding three-dimensional sculptural

works protected by the Robot Copyrights will be dismissed.

### 6.    The Robots' Facial Screens as an Audiovisual Work

      The Court now turns to the issue of the audiovisual works protected by the Robot

Copyrights, which are VECTOR's and COZMO's screens displaying their faces accompanied by

a sound.[8]  Each of VECTOR, COZMO, and EMO's faces displays specific animations and

graphics in response to different external stimuli on a screen that is located on the front plane of

their heads.  The display of an animation or graphics is typically accompanied by a related sound—

for example, when showing that it is raining, a rainfall noise is emitted.  As the Court observed

---

[8] Initially, the parties disputed whether the two videos that were filed with the registration of the Robot Copyrights were *themselves* the protectable audiovisual content or whether those videos were representative portions of the audiovisual work (the faces of COZMO and VECTOR) shown in the videotape.  *Compare* ECF No. 30 at 11-12 *with* ECF No. 34 at 7.  Ultimately, both parties agreed that DDL's registered videos were representative portions of the audiovisual visual material on the faces of the robots.  *See* ECF No. 34 at 7 (citing U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 1509.2(E)(2) (3d ed. 2021));  ECF No. 37 at 1–2 (same).  Under § 1509.2(E)(2) of the Compendium, "[t]o register an audiovisual work that has been fixed or published solely in machine-readable copies other than a CD-ROM," an applicant should submit a videotape or a series of photographs depicting representative portions of the copyrightable content of the work and separate synopsis of the work.

during the live demonstration, VECTOR, COZMO, and EMO do not cycle through a preset or defined sequence of images and sounds.  Instead, each robot screen uses artificial intelligence to display specific animations and graphics with sounds based on the robot's reaction to its environment and user.  *See also* ECF No. 53 at 11:4–9.

As an initial matter, Living.AI contends that the Second Amended Complaint's comparison of discrete animations, graphics, and sounds inappropriately "parses" the Robot Copyright to establish discrete independent copyright violations for each individual expression by the robots. ECF No. 30 at 6, 11–12.  However, because the robots express themselves based on reactions to the environment and users, rather than in a sequential manner like a movie, the charts comparing the robots' animations, graphics, and sounds are more properly viewed as examples used to show the alleged infringement of the Robot Copyright as a whole rather than discrete independent copyright violations.  *See* Observations.  As discussed above in Section III.A.4, in considering a claim of copyright infringement, the Court takes into account the total concept and feel of VECTOR's, COZMO's, and EMO's faces and has done so when observing each robot's facial expression during the live demonstration.

Next, Living.AI contends that the animations and graphics—such as setting an alarm or displaying a weather report—are not protectable as they are either functional characteristics or stock gestures of a robot.  ECF No. 30 at 14–16.  Living.AI argues that if such animations and graphics were protectable, DDL would prevent all other robots from offering these standard functions.  ECF No. 37 at 2 ("[DDL] does not get to control and restrict the ability of all other robots to offer these functions in a standard fashion.").  DDL responds that Living.AI's interpretation of COZMO's and VECTOR's functional characteristics is overly broad, and that DDL's *expression*

18

of the various functions for COZMO and VECTOR is what is protectable under the Robot Copyrights.  ECF No. 34 at 11–12.

Under the "scènes à faire" doctrine, courts exclude from copyright protection elements that are "standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting." *Dun & Bradstreet Software Servs. v. Grace Consulting, Inc.*, 307 F.3d 197, 214 (3d Cir. 2002) (quoting *Gates Rubber Co. v. Bando Chem. Indus.*, 9 F.3d 823, 838 (10th Cir. 1993)).  This prevents a copyright from "monopolizing an underlying idea—via features that are so common or necessary to that idea's expression that copyrighting them effectively copyrights the idea itself." *Silvertop Assocs.*, 931 F.3d 215, 223 (3d Cir. 2019).[9]

Thus, the Court excludes from its analysis the idea of a robot responding to questions or providing information, such as the weather, as unprotectable.  Such abilities are expected features that a humanoid robot may be expected to have.  However, VECTOR and COZMO express such functions in a particularized way, and that particularized expression is protectable under the Robot Copyrights.  As an example,[10] when VECTOR indicates that it is raining, raindrops begin to fall on its eyes and the drops bounce off the top of its eyes with a splash and trickle down its face, VECTOR then partially closes and lowers its eyes as the rain continues.  *See* Observations.  Similarly, when EMO indicates that it is raining, raindrops fall on its eyes, bounce off the top of the eyes with a splash, and continue to trickle down, while EMO partially closes and lowers its

---

[9] Rarely, "an author's expression becomes indistinguishable from the idea he seeks to convey, such that the two merge." *Educ. Testing Servs. v. Katzman*, 793 F.2d 533, 539 (3d Cir. 1986);  ECF No. 53 at 9:21–10:7 (contending that the expression of emotions may approach a finding of merger).  For the reasons discussed herein, a robot's face conveying emotions and information is subject to varying expressions of the idea.

[10] Because none of the robots' screens are static, the Court is limited to conveying the observed similarities through discrete examples.

eyes.  *Id*.  When VECTOR and EMO take pictures, their eyes turn from squares to circles and

rotate like a focusing camera lens, and then blink when taking a picture.  *Id.*  None of those

graphical animations are necessary to the related function.  A robot could show that it is raining in

different ways, such as showing a raincloud over the robot's face or displaying an umbrella over

its head.  A robot could show taking a picture by taking out its own camera and putting it in front

of its face, by showing a countdown timer with a flash when the picture is taken, or otherwise

prompting the user to say "cheese."  Thus, the Court does not find the expression of such functions

to necessarily be stock or standard such that they "monopoliz[e] an underlying idea."  *Silvertop*

*Assocs.*, 931 F.3d 215, 223 (3d Cir. 2019).

 Next, in support of the idea that VECTOR's and COZMO's faces are unprotectable,

Living.AI contends that that there is only a limited range of expression possible for robot eyes

displaying emotions.  Living.AI points to the robot BURN-E from the movie WALL-E as an

example of two rectangular (almost square) blue/green[11] glowing boxes with rounded edges that

move as eyes.  ECF No. 30 at 15–16 (contending that identified animations are standard or stock

expressions);  ECF No. 30 at 2 (picture of BURN-E);  ECF No. 53 at 9:7–13 ("there's only so

much… possible expression here, because what the eyes do is they're somewhat rectangular; and

they change emotions based on changing the lines at the top and bottom of the eyes.");  ECF No.

53 at 25:10–12.

---

[11] The Second Amended Complaint shows that VECTOR's eyes are more green and COZMO's eyes are more blue, whereas EMO's eyes are more of a blue/green.  In the live demonstration, counsel referred to the robots' eyes as blue. ECF No. 53, 14:20-24 ("We have a very distinctive pattern of eyes …  They are of a particular shape, roughly rectangular with rounded corners, the same color blue…");  10:8–15 (analogizing to the robot BURN-E from the movie WALL-E, who "has eyes that are blue and rectangular…");  *see also,* ECF No. 30 at 2 (referring to BURN-E's blue eyes).

However, even in cases where there is a limited range of possible expressions, such as the depiction of an animal, that particularized expression may be entitled to certain copyright protections because the original expression of that idea requires "only a minimal amount of creativity." *Silvertop Assocs.*, 931 F.3d 215, 219, 221–22 (3d Cir. 2019) (citing *Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 207 (3d Cir. 2005)) (rejecting defendants' contention that "the banana is unoriginal because its designers based the design on a natural banana" because "the essential question is whether the depiction of the natural object has a minimal level of creativity"); *see also, Satava v. Lowry*, 323 F.3d 805, 812 (9th Cir. 2003) (noting that copyright contributions of jellyfish sculptures were limited only to the original elements of "distinctive curls of particular tendrils; the arrangement of certain hues; the unique shape of jellyfishes' bells," but did not extend to "jellyfish physiology or the glass-in-glass medium"); *Aurora World, Inc. v. TY Inc.*, Case No. CV 09-08463 MMM (Ex), 2011 U.S. Dist. LEXIS 161676, at *39–40 (C.D. Cal. Mar. 14, 2011) (noting a "wide range of varying artistic decisions that could be made concerning the color of the [plush animal] toys' tails, ears, arms, legs and faces, the rings around the eyes, and the animals' facial expressions."). Here, the arguable range of possible expression related to a desktop robot is broader than the expression of elements found in nature. *Cf. Silvertop Assocs. v. Kangaroo Mfg.*, 319 F. Supp. 3d 754, 766–67 (D.N.J. 2018) ("The Court understands there are admittedly few features to a banana but it does not necessarily follow that there are consequently only a few unique ways of designing a banana costume. In fact, the contrary appears to be true."). Nonetheless, the Court recognizes that the audiovisual works at issue here are not the entire robot—but rather VECTOR's and COZMO's screens displaying their faces and accompanying sounds. Like VECTOR and COZMO, EMO also displays human-like emotions on its screen through movements of its eyes and accompanying sounds.

The idea of robots displaying such humanoid emotions on their faces and with accompanying sounds is not protectable;  nor is using only eyes to convey emotions by changing their size and direction.  Most people would recognize the emotion of sadness when eyes are tilted downwards, the expression of anger or frustration when eyes are pushed together as a result of a furrowed brow, the expression of surprise when eyes open wide and move upward, or the expression of sleepiness when eyes slowly close.  Nonetheless, the expression of such emotions through VECTOR's and COZMO's particularized eyes (shape, size, color, location, movement), along with the accompanying sound creates a protectable expression of a robot's emotions.

Here, Living.AI contends, VECTOR, COZMO, and EMO all express their emotions through two rectangles, which limits the possibility for expression of these emotions.  While it is true that the use of two rectangular (and at times, square) blue/green glowing boxes with rounded edges as eyes is simpler as audiovisual material than videogames,[12] even relatively simple designs may be protectable by copyright.  For example, in *Nirvana, LLC v. Mar[c] Jacobs International, LLC*, two designs that had smiley faces[13] were substantially similar, because certain features of the "Happy Face" copyright were distinguishable from the generic idea of a smiley face, and allegedly

---

[12] Living.AI contends that this case differs from videogame cases, because the games at issue had screens featuring more complex elements such as ghost-chasing by a Pacman figure and Tetris blocs.  ECF No. 53 at 24:24–25:8.

[13]



infringing products used the same color scheme and similar font placement as the "Happy Face."[14]
No. LA CV18-10743 JAK (SKx), 2019 U.S. Dist. LEXIS 225708, at *32–33 (C.D. Cal. Nov. 8,
2019).

Finally, Living.AI contends that the Court should not take into account what other choices
Living.AI could have made when designing EMO and should instead focus on what is on the
screen—two rectangular blue/green glowing boxes with rounded edges that move as eyes.
Contrary to Living.AI's assertion, courts in the Third Circuit and others have recognized the
significance of alternative ways of expressing a particularized idea. *Silvertop Assocs.*, 931 F.3d,
at 223  (finding that "[a]lthough a banana costume is likely to be yellow, it could be any shade of
yellow—or green or brown for that matter.  Although a banana costume is likely to be curved, it
need not be—let alone in any particular manner.  And although a banana costume is likely to have
ends that resemble a natural banana's, those tips need not look like [the copyrighted costume's]
black tips (in color, shape, or size).… the record includes over 20 examples of banana costumes
that …  would be non-infringing."); *Mattel, Inc. v. MGA Entm't, Inc.*, Nos. 09-55673, 09-55812,
2010 U.S. App. LEXIS 26937, at *27 (9th Cir. July 22, 2010) (noting that there is a "wide range
of expression for complete young, hip female fashion dolls with exaggerated features"). *JCW Invs.
v. Novelty, Inc.*, 482 F.3d 910, 917 (7th Cir. 2007) ("[Defendant] could have created another plush
doll … He could, for example, have a blond mullet and wear flannel, have a nose that is drawn on

---

[14] The district court found the protectable elements included "(i) [t]he slightly asymmetrical circle shape of the face;
(ii) the relatively wide placement of the eyes; (iii) the distinctive squiggle of the mouth; and (iv) the placement and
use of a stuck out tongue in the same shape on the same side of the mouth." *Nirvana, LLC v. Mar[c] Jacobs Int'l,
LLC*, No. LA CV18-10743 JAK (SKx), 2019 U.S. Dist. LEXIS 225708, at *29 (C.D. Cal. Nov. 8, 2019) (internal
quotations omitted).

rather than protruding substantially from the rest of the head, be standing rather than ensconced in an armchair, and be wearing shorts rather than blue pants").

Here, Living.AI also had choices to alter the way in which EMO showed emotions—EMO could have had other facial features:  a mouth, a nose, dimples, pupils, freckles, hair, ears, glasses. EMO also could have had differently sized or differently shaped eyes—oval, round, triangular, with or without rounded edges.  EMO also could have had different proportions of the eyes and face.  Thus, the Robot Copyrights protect DDL's particularized expression of VECTOR's and COZMO's faces that shows emotion through only their eyes and accompanying sounds.  The Court concludes that a reasonable jury could find that the audiovisual works are substantially similar. *See Tanksley*, 902 F.3d at 172.  In this case, VECTOR, COZMO, and EMO all have glowing, blue/green, rectangular (at times square), eyes with rounded edges that fade towards the edge of the eyes.  Their eyes appear approximately on the center of the face, with a black background. When expressing an emotion, each VECTOR, COZMO, and EMO have a metallic, high-pitched, and overexaggerated sound to accompany the expression of each emotion.  When conveying information, such as weather or time, the robots have similar aesthetic animations.  Having considered the audiovisual works at issue—that is, VECTOR's, COZMO's, and EMO's face screens with accompanying sounds—the Court finds that, given "the total concept and feel" of their screens, an ordinary observer may perceive that EMO's face has copied protected elements of VECTOR's and COZMO's face.  Therefore, Living.AI's Motion to Dismiss will be denied in part, such that DDL's copyright infringement claim regarding the audiovisual works of VECTOR and COZMO will not be dismissed.

**B.      Living.AI's Motion to Dismiss the Trademark Infringement Claim on the Grounds of Nominative Fair Use Will Be Denied**

### 1.      The Parties' Arguments

In Count II, DDL contends that Living.Ai uses the VECTOR Trademark without DDL's consent to advertise, promote, and sell EMO by creating a false association between DDL, VECTOR and EMO.  ECF No. 27 ¶¶ 106–25.  Living.AI admits that it refers to DDL's VECTOR robot in its advertising, but contends that it is permitted to do so, to show that EMO is compatible with VECTOR, under the affirmative defense of nominative fair use.  ECF No. 37 at 2–3;  *see also*, ECF No. 30 at 19–20;  ECF No. 34 at 16.

### 2.      Likelihood of Confusion as an Element of Trademark Infringement Claim

As a preliminary matter, although the bulk of Living.AI's Motion revolves around the affirmative defense of nominative fair use, it is unclear whether Living.AI also seeks dismissal on the likelihood of confusion element of a trademark infringement claim.  To the extent that Living.AI's Motion can read to seek dismissal on the likelihood of confusion element of a trademark infringement claim, *see* ECF No. 30 at 19–20, the Court rejects such grounds for dismissal at this stage.

To prevail on a trademark infringement claim, a plaintiff must show that (1) the marks are valid and legally protectable;  (2) plaintiff owns the marks;  and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods

or services.  *Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990).

In the nominative fair use context, the traditional *Lapp*[15] factors, which are used to evaluate the likelihood of confusion elements, must be tailored to only those that are "meaningful and probative in the context of nominative fair use."  *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 224 (3d Cir. 2005).  Here, the Second Amended Complaint sufficiently alleges that there is likelihood of confusion.  For the purposes of this Motion, the Court finds that the Second Amended Complaint sets forth factual allegations related to many of the *Lapp* factors that are "sufficient … to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

DDL alleges that Living.AI has not used the VECTOR Trademark for a significant amount time without giving rise to actual confusion.  *Id*. ¶¶ 38, 81 (alleging that when the EMO "pre-launch marketing video was released in the United States, individuals commenting on online forums and chat boards, as well as technology reviewers, immediately assumed that EMO had been developed by DDL as an updated version" of VECTOR and/or COZMO).  Further, DDL alleges that by using the VECTOR Trademark, Living.AI intended to create a false association between VECTOR and EMO and a false endorsement of EMO and Living.AI by DDL.  *Id*. ¶¶ 33, 38, 58.  The Second Amended Complaint and accompanying exhibits show that there is not only

---

[15] *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462-63 (3d Cir. 1983) (citing *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir. 1978)) ("(1) the degree of similarity between the owner's mark and the alleged infringing mark;  (2) the strength of the owner's mark;  (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;  (4) the length of time the defendant has used the mark without evidence of actual confusion arising;  (5) the intent of the defendant in adopting the mark;  (6) the evidence of actual confusion;  (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;  (8) the extent to which the targets of the parties' sales efforts are the same;  (9) the relationship of the goods in the minds of consumers because of the similarity of function;  (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market").

evidence of actual confusion, but also evidence that EMO and VECTOR are related in the minds of consumers because they share similar functions.  *Id.* ¶¶ 32, 38, 45, 66;  *see also* ECF No. 27-12.  Finally, the Second Amended Complaint alleges that EMO and VECTOR are competing in the market of desktop robots with artificial intelligence and are marketed and advertised through the internet, social media, and crowdfunding websites.  ECF No. 27 ¶ 17 (alleging that VECTOR was introduced via Kickstarter), ¶¶ 27–33 (detailing social media presence), ¶¶ 54–57, 85–90 (detailing attempts to sell EMO online).

### 3. Nominative Fair Use as an Affirmative Defense to Trademark Infringement

The Court now turns to the issue of nominative fair use.  In the Third Circuit, nominative fair use is an affirmative defense.  *See Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 222 (3d Cir. 2005).  "Nominative fair use [] occurs if the only practical way to refer to something is to use the trademarked term."  *Id.* at 214 (citing *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 328 F.3d 1061, 1072 (9th Cir. 2003)) (rev'd. on other grounds) (quotations omitted).  Nominative fair use cases are governed by a two-step approach:  (1) the plaintiff must prove that defendant's use of the plaintiff's mark is likely to cause confusion;  (2) the defendant must show that his nominative use of plaintiff's mark was nonetheless "fair."  *Century 21 Real Estate Corp.*, 425 F.3d at 222.  To establish that the use was "fair," a defendant must show "(1) that the use of plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service;  (2) that the defendant uses only so much of the plaintiff's mark as is necessary to describe plaintiff's product;  and (3) that the defendant's conduct

or language reflect the true and accurate relationship between plaintiff and defendant's products or services."  *Id.*

To grant a motion to dismiss based on the affirmative defense of nominative fair use, the Court must determine whether nominative fair use appears on the face of the Complaint.  *Victaulic v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007);  *Am. Auto., Ass'n v. CFO Optical Grp., Inc.*, No. 08-4246 (AET), 2009 U.S. Dist. LEXIS 140129, at *4 (D.N.J. Apr. 3, 2009) (defendant was not entitled to dismissal on the grounds of nominative fair use because it was not clear on the face of the complaint whether the use of the mark was necessary or appropriate and whether more could have been done to prevent improper inference as to the parties' relationship).

### 4.  Living.AI Fails to Show That It Is Entitled to the Affirmative Defense of Nominative Fair Use

Living.AI contends that DDL has failed to plead facts that show Living.AI's use of the VECTOR Trademark is anything other than permissible fair use.  ECF No. 30 at 19;  ECF No. 37 at 2).  Specifically, Living.AI has never denied that it referenced the VECTOR robot in its advertisements.  ECF No. 37 at 2.  Instead, Living.AI focuses on whether it is permissible to reference the VECTOR Trademark to demonstrate its compatibility with EMO and contends that DDL has not identified any instance where Living.AI's use of the VECTOR trademark indicates anything other than compatibility between the robots.  *Id*.

Living.AI's argument ignores the procedural posture in this case.  Indeed, courts in the Third Circuit have generally declined to grant a motion to dismiss on the grounds of nominative fair use without further discovery.  *See Impact Applications, Inc. v. CNS Vital Signs*, Civil Action No. 13-580, 2013 U.S. Dist. LEXIS 158261, at *17 (W.D. Pa. Sep. 26, 2013) (Mitchell, J.); *Amerigas Propane, L.P. v. Op. Corp.*, No. 12-713, 2012 U.S. Dist. LEXIS 84679 at *22–23 (E.D. Pa. June 19, 2012) (finding it "premature to make any findings with respect to nominative fair use

without the benefit of discovery"); *see Pa. State Univ. v. Keystone Alternatives LLC*, 2020 U.S. Dist. LEXIS 38617, at *7–9 (M.D. Pa. Mar. 5, 2020) (collecting cases and noting that "[d]istrict courts within the Third Circuit regularly decline to consider nominative fair use on a motion to dismiss because the analysis requires factual development.").

Living.AI contends that no additional discovery or factual development is needed, and thus the affirmative defense of nominative fair use can be resolved on the face of the Second Amended Complaint. *See* ECF No. 37 at 3. Here, the Second Amended Complaint alleges that the VECTOR Trademark was used to convey that VECTOR and EMO were "friends." *See* ECF No. 27 ¶¶ 27, 32, 33 (alleging that Living.AI used "a series of posts on the social media platforms Instagram® and Facebook®, including a Facebook® page with multiple posts indicating that 'VECTOR® and EMO are friends'"). The Court cannot discern from these allegations whether the VECTOR Trademark was used in a way that (i) was necessary, (ii) was limited to only what was necessary, and (iii) reflected the true and accurate relationship between the parties and their robots. *See Amerigas Propane, L.P. v. Op. Corp.*, No. 12-713, 2012 U.S. Dist. LEXIS 84679, at *22–23 (E.D. Pa. June 19, 2012). Indeed, the use of the word "friends" itself does not indicate that such a statement was necessary to express compatibility, proportional, or truly and accurately described the parties' relationship and their robots.

Accordingly, the Court finds that any analysis of Living.AI's affirmative defense of nominative fair use is premature and will therefore deny Living.AI's Motion to Dismiss Count II on this ground.

C.      **Living.AI's Motion to Dismiss the Trade Dress Infringement Claim Will Be Granted**

1.  **A Party Seeking Trade Dress Protection Must Give Adequate Notice of What Overall Look It Wishes to Protect**

In Count III, DDL claims that Living.AI infringed its trade dress by "use of a knockoff duplicate or confusingly similar imitation of both VECTOR® and COZMO® trade dress" that has caused confusion among consumers.  ECF No. 27 ¶¶ 126–38.

Trade dress protection under the Lanham Act protects "incidental, arbitrary or ornamental product features which identify the product's source."  *Shire U.S., Inc. v. Barr Labs., Inc.*, 329 F.3d 348, 353 (3d Cir. 2003);  15 U.S.C. § 1125(a);  *see also, Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 308 (3d Cir. 2014).  Trade dress is "the total image or overall appearance of a product, and includes, but is not limited to, such features as size, shape, color combinations, texture, graphics, or even a particular sales technique."  *McNeil Nutritionals, LLC v. Heartland Sweeteners*, *LLC*, 511 F.3d 350, 357 (3d Cir. 2007) (quoting *Rose Art Indus., Inc. v. Swanso*n, 235 F.3d 165, 171 (3d Cir. 2000).

Although "whether a party has alleged trade dress entails the sort of factual review rarely conducted by courts at the motion to dismiss stage," *I.M. Wilson, Inc. v. Otvetstvennostyou "GRICHKO"*, 500 F. Supp. 3d 380, 407 (E.D. Pa. 2020), on a motion to dismiss, the party seeking to protect a design must give "adequate notice of what overall look it wishes to protect."  *Fair Wind Sailing*, 764 F.3d at 310.

Under the Lanham Act, to establish trade dress infringement, a plaintiff must prove that: "(1) the allegedly infringing design is non-functional;  (2) the design is inherently distinctive or has acquired secondary meaning;  and (3) consumers are likely to confuse the source of the

plaintiff's product with that of the defendant's product." *McNeil Nutritionals*, 511 F.3d at 357; *Fair Wind Sailing, Inc*. 764 F.3d at 309.

Prior to analyzing these three elements, a district court should scrutinize the complaint's description of its "trade dress to ensure itself that the plaintiff seeks protection of ***visual elements*** of its business." *Fair Wind Sailing, Inc.*, 764 F.3d at 309 (emphasis added); *see also*, *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 630 (6th Cir. 2002) (Although "any 'thing' that dresses a good can constitute trade dress," the "thing" must "dress[] a good."). In the Third Circuit, a complaint must "articulat[e] the specific elements which comprise its distinct dress," *Fair Wind Sailing, Inc.*, 764 F.3d at 309, to ensure that plaintiff's trade dress allegations are not "pitched at an improper level of generality." *Id.* (citing *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997)).  To do so, a complaint must "enumerate what specific elements …comprise a distinctive trade dress." *Fair Wind Sailing, Inc.*, 764 F.3d at 310;  1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 8:3 (4th ed. 2014) ("[T]he discrete elements which make up the [trade dress claim] should be separated out and identified in a list.");  *see also Truinject Corp. v. Nestlé Skin Health, S.A.*, No. 19-592-LPS-JLH, 2020 U.S. Dist. LEXIS 2541, at *48 (D. Del. Jan. 7, 2020).

Finally, where the plaintiff seeks protection for a series or an entire line of products, there must be a "recognizable and consistent overall look." *Rose Art Indus. v. Swanson*, 235 F.3d 165, 172–73 (3d Cir. 2000).  Only after such showing can the district court analyze whether the three elements to establish trade dress infringement are met. *Id.* at 173.

### 2. DDL Does Not Give Adequate Notice of What Overall Look It Wishes to Protect

Here, Living.AI alleges that the Second Amended Complaint (i) fails to specify and clearly define the protectable "trade dress"; (ii) incorporates functional robot properties that cannot be considered as trade dress; (iii) in the alternative, fails to plead "the existence of secondary meaning in sufficient detail." *See* ECF No. 30 at 21–23; ECF No. at 37 at 4–5. DDL counters that (i) it "specifically listed the various components and features of" COZMO and VECTOR, "all of which, both individually and collectively," create a visual impression that identifies the source of the robots as DDL; (ii) the functionality of the elements of the trade dress does not necessarily mean that the trade dress as a whole is functional; and (iii) DDL has sufficiently pled secondary meaning that specifically identifies VECTOR and COZMO as its brands. ECF No. 34 at 17–20.

Because the Court finds that DDL has failed to enumerate the elements of its trade dress in a way that gives Living.AI adequate notice of the overall look that DDL wishes to protect, the Court need not address the parties' arguments regarding functionality and secondary meaning.

DDL points to paragraphs 69 through 71 as setting forth "a detailed list of the specific elements that encompass the protectable trade dress of" VECTOR and COZMO. ECF No. 34 at 17. While the Court acknowledges that DDL has listed elements, the actual content of the list falls short of providing "adequate notice of what overall look it wishes to protect." *Fair Wind Sailing*, 764 F.3d at 310.

First, as Living.AI points out, many of the elements that DDL alleges as "protectable trade dress" cannot be construed as "dress." For example, non-visual items such as "specific and unique sound effects," the "movement of the robot and robot head," as well as designs of the interactive

cubes, which are completely detached from the VECTOR and COZMO robots, cannot be considered dress.  *See* ECF No. 27 at ¶¶ 68, 69(f)–(h).

Even viewing the Second Amended Complaint in the light most favorable to the DDL and ignoring the above items that are not "dress," the Second Amended Complaint does not "articulat[e] the specific elements which comprise its distinct dress," *Fair Wind Sailing*, 764 F.3d at 309 (emphasis added), because DDL's description of its trade dress is open-ended.  Although the Second Amended Complaint refers to pictures of VECTOR and COZMO to help define its trade dress, the Second Amended Complaint also alleges that "[t]he trade dress components and features of the VECTOR® and COZMO® robots *include both individually **in certain instances** and collectively*" certain enumerated elements.  ECF No. 27 ¶ 69 (emphasis added).  Courts have dismissed trade dress claims where language fails to circumscribe the exact trade dress that a party is seeking to protect.  *Classic Touch Décor, Inc. v. Michael Aram, Inc.*, No. 15-CV-453 (NGG) (RLM), 2015 U.S. Dist. LEXIS 144636 at *12 (E.D.N.Y. Oct. 23, 2015) (noting in the Rule 12(c) context that plaintiff "cannot claim trade dress protection for an element that appears 'sometimes' or only 'in some instances,' because it renders the presence of the element meaningless.");  *Mosaic Brands, Inc. v. Ridge Wallet LLC*, No. 2:20-cv-04556-AB (JCx), 2020 U.S. Dist. LEXIS 219857, at *17–18 (C.D. Cal. Oct. 29, 2020) ("Courts have often dismissed trade dress claims for failing to provide a complete list of elements where the list of alleged trade dress elements is preceded by a non-limiting qualifier.");  *cf.*, *Tetris Holding, LLC v. Xio Interactive, Inc.*, 863 F. Supp. 2d 394, 415 n.16 (D.N.J. 2012) (noting that the use of the "including, but not limited to" required the court to construe the trade dress as alleged because "[p]laintiffs have had sufficient time to determine exactly the contours of the alleged trade dress violation and for purposes of this motion, this is the trade dress that [the Court] will consider.").  Further, DDL states that "it is unknown whether the

final EMO robot may copy other trade dress features and this issue can be developed in discovery in this matter." ECF No. 34 at 17 n.8. Thus, the non-exclusive description of VECTOR and COZMO's trade dress in the Second Amended does not contain the discrete elements of trade dress so as to provide "adequate notice of what overall look [DDL] wishes to protect." *Fair Wind Sailing*, 764 F.3d at 310; *see Sleep Sci. Partners v. Lieberman*, No. 09-04200 CW, 2010 U.S. Dist. LEXIS 45385 (N.D. Cal. May 10, 2010) (noting that plaintiff's language suggests that the listed components of trade dress "are only some among many, which raises a question of whether it intends to redefine its trade dress at a future stage of litigation.").

Finally, it is unclear whether DDL is alleging the existence of trade dress across the series of products—the VECTOR and COZMO robots—or for each robot individually. Indeed, some of the purported elements that DDL seeks to include as trade dress include "expression and utility graphics programmed and integrated into [VECTOR] ***only***." ECF 27 at 27 n.5 (emphasis added).

For the above-mentioned reasons, the Second Amended Complaint (i) if read as trade dress claim for the series of robots (VECTOR and COZMO), fails to articulate an "overall consistent look" and (ii) if read as a trade dress claim for each of VECTOR and COZMO, fails to provide "adequate notice of what overall look it wishes to protect." Therefore, the Court will grant Living.AI's Motion to Dismiss Count III.

## IV.     Conclusion

For the reasons set forth above, Living.AI's Motion to Dismiss Plaintiff's Second Amended Complaint will be GRANTED in part and DENIED in part as set forth in the accompanying ORDER.

DATED this 28th day of February 2022.

BY THE COURT:


/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge




cc (via ECF email notification):

All Counsel of Record