IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DIGITAL DREAM LABS, INC, <br><br> Plaintiff and Counter Defendant, <br><br> vs. <br><br> LIVING TECHNOLOGY (SHENZHEN) CO., <br><br> Defendant and Counter Claimant, <br><br> H. JACOB HANCHAR, <br><br> Counter Defendant. | 2:20-CV-01500-CCW |

**MEMORANDUM OPINION**

Before the Court is Plaintiff Digital Dream Labs, Inc.'s ("DDL") and Counter Defendant H. Jacob Hanchar's Motion to Dismiss Defendant Living Technology (Shenzhen) Co.'s (doing business as "Living.AI") Counterclaims. ECF No. 69. For the reasons that follow, DDL's Motion will be GRANTED IN PART and DENIED IN PART.

**I.   Background**

This case remains, as the Court observed when it ruled upon Living.AI's Motion to Dismiss DDL's Second Amended Complaint, "a case about dueling interactive desktop robots." ECF No. 54 at 1. DDL sells and markets two such robots—VECTOR and COZMO—for which it claims to hold various copyrights and trademarks. ECF No. 27 ¶¶ 5, 15. DDL alleges that Living.AI, the maker of a rival robot—EMO—infringed on those copyrights and trademarks. *Id.* ¶¶ 17, 26. To redress the alleged wrongs, DDL brought claims for copyright infringement (Count I), trademark infringement (Count II), and trade-dress infringement (Count III), which Living.AI moved to dismiss. *See generally id.*; ECF No. 29. The Court granted in part and denied in part that motion to dismiss, ruling that DDL: (1) could proceed on its copyright claim as to VECTOR's and

COZMO's faces as audio-visual works, though not their bodies as three-dimensional sculptural works; (2) DDL could proceed on its trademark claim; and (3) DDL failed to plead its trade-dress claim. *See generally* ECF No. 54.

After the Court's ruling, Living.AI asserted that the scope of the case has now expanded beyond the robots themselves. In its Answer to the Second Amended Complaint, Living.AI alleges that "[a]lmost immediately after" the Court ruled on Living.AI's motion to dismiss:

> DDL and Mr. Hanchar, acting on his own or through DDL personnel, or other individuals taking direction from DDL and/or Mr. Hanchar, began a malicious campaign of disseminating false information about the status of the litigation to the public in an effort to disrupt Living.A[I]'s business relationships and cause harm to Living.A[I].

ECF No. 56 ¶ 18.[1] For example, Living.AI alleges that Steve Coblentz, a DDL employee, posted on Facebook that "EMO is done," that Living.AI was "sued for being a knocking [sic] off and lost," and that Living.AI is a "thief" that was "caught red handed." *Id.* ¶¶ 19–24. Living.AI further alleges that when one social media commenter remarked that the case hadn't been "decided yet," Mr. Coblentz responded that "it has been decided by a federal judge[,] lol[.] They lost." *Id.* ¶ 24. As for Mr. Hanchar, Living.AI alleges that after the Court issued its ruling, he, among other things, declared victory "against China" in a social media post (Living.Ai is a Chinese company) and appeared on local news in Pittsburgh "claiming to have won a legal battle." *Id.* ¶ 25.

Based on these and other statements by Messrs. Hanchar and Coblentz, Living.AI brought state-law counterclaims for intentional interference with contract (Count III), intentional interference with prospective economic advantage (Count IV), and trade libel (Count V), in

---

[1] Living.AI's Answer includes numbered paragraphs 1–138 responding to the corresponding allegations in DDL's Second Amended Complaint, but also includes factual allegations in support of its counterclaims in separately numbered paragraphs 1–64. *See generally* ECF No. 56. Unless otherwise indicated, references to numbered paragraphs in citations to Living.AI's Answer are to the additional factual allegations that Living.AI makes in support of its counterclaims.

addition to counterclaims seeking declarations that EMO does not infringe upon DDL's copyrights or trademarks (Counts I and II). *See generally* ECF No. 56. DDL, in turn, has moved to dismiss the state-law claims in Counts III through V, arguing that Living.AI has failed to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6). ECF Nos. 69, 70. Living.AI filed its opposition, ECF No. 71, DDL filed its reply, ECF No. 72, and DDL's Motion is now ripe for adjudication.[2]

## II.     Standard of Review

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a claim. In reviewing a motion to dismiss, the court accepts as true a complaint's factual allegations and views them in the light most favorable to the plaintiff. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d. Cir. 2008). Although a complaint need not contain detailed factual allegations to survive a motion to dismiss, it cannot rest on mere labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is, "a formulaic recitation of the elements of a cause of action will not do." *Id.* Accordingly, "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and be "sufficient . . . to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than the sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

The United States Court of Appeals for the Third Circuit has established a three-step process for district courts to follow in analyzing a Rule 12(b)(6) motion:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to

---

[2] This Court has federal question jurisdiction over DDL's copyright and trademark claims, as well as over Living.AI's counterclaims seeking declaratory judgments of noninfringement. *See* 28 U.S.C. § 1331. We have supplemental jurisdiction over Living.AI's state law counterclaims, 28 U.S.C. § 1367.

>the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)). That said, under Rule 8's notice pleading standard, even after the Supreme Court's decisions in *Twombly* and *Iqbal*, a plaintiff need only "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Connolly v. Lane Constr. Corp.*, 809 F.3d 780, 788–89 (3d Cir. 2016) (finding that "at least for purposes of pleading sufficiency, a complaint need not establish a *prima facie* case in order to survive a motion to dismiss").

### III. Discussion

Living.AI's three state-law counterclaims have substantial overlap. In each, it alleges that DDL, through Mr. Coblentz, and, to a lesser extent, Mr. Hanchar, made false statements about Living.AI and the status of this litigation, which caused harm to Living.AI's bottom line and reputation. *See generally* ECF No. 56. DDL and Mr. Hanchar, in their Motion to Dismiss, argue that Living.AI's allegations fail to plausibly allege various elements of each claim. They also raise a threshold argument; namely, that Mr. Coblentz's social media posts cannot serve as a basis for a claim against DDL and Mr. Hanchar because the statements were not made in the scope of Mr. Coblentz's employment. ECF No. 70 at 6–7. Because that threshold argument determines the scope of review for the remaining issues, the Court will address it first. The parties, which have cited only Pennsylvania law, implicitly agree that Pennsylvania law controls. *See Commonwealth Cap. Corp. v. Getronics, Inc.*, 147 Fed. App'x 253, 254–55 (3d Cir. 2005) (requiring federal courts sitting in diversity to apply the law that the parties "explicitly or implicitly" have chosen).

### A. Living.AI Has Failed to Plausibly Allege that Mr. Cobletz's Actions Are Attributable to DDL

For Mr. Coblentz's allegedly wrongful statements to support claims against DDL and Mr. Hanchar, Living.AI must plausibly allege that Mr. Coblentz was acting within the scope of his employment. *See Potter Title & Trust Co. v. Knox*, 113 A.2d 549, 551 (Pa. 1955); *Wang v. Univ. of Pittsburgh*, No. 2:20-cv-1952, 2021 WL 6051568, at *18 (W.D. Pa. Dec. 21, 2021) (Horan, J.) (dismissing libel and intentional interference claims where plaintiff failed to allege that actions of unidentified parties were attributable to the defendant). Living.AI has failed to make such a showing in its pleadings.

Pennsylvania courts follow the Restatement (Second) of Agency (1958) to determine whether an employee's actions fell within the scope of their employment such that the employer may be held liable. *Justice v. Lombardo*, 208 A.3d 1057, 1060(Pa. 2019). Under the Restatement,

> (1) Conduct of a servant is within the scope of employment if, but only if:
>     (a) it is of the kind he is employed to perform;
>     (b) it occurs substantially within the authorized time and space limits; [and]
>     (c) it is actuated, at least in part, by a purpose to serve the master . . .
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Restatement (Second) of Agency § 228 (1958). Actions not expressly authorized may still be within the scope of employment if they are "of the same general nature as that authorized, or incidental to the conduct authorized." *Id.* § 229. Notably, "[p]roof that the actor was in the general employment of the master does not of itself create an inference that a given act done by him was within the scope of employment. *Id.* § 228 cmt. b.

DDL argues that the pleadings are insufficient to show that posting about DDL on social media is within the scope of Mr. Coblentz's employment. ECF No. 70 at 6–7. In response, Living.AI relies heavily upon exhibits that were not made a part of its pleadings to argue that Mr.

5

Coblentz was acting with DDL's apparent authority. *See generally* ECF No. 71. In these exhibits, which display additional social media posts, Mr. Coblentz documents his attendance at robotics conferences with Mr. Hanchar on behalf of DDL and interacts with Mr. Hanchar regarding DDL, among other things. *Id.* Beyond its new exhibits, Living.AI points to its allegations that Mr. Coblentz is in fact employed by DDL, and "hold[s] himself out" as "Executive Assistant to CEO Digital Dream Labs" on his Facebook page. ECF No. 71 at 2 (citing ECF No. 56 ¶ 3; ECF No. 56-11). Living.AI also notes that, in posts attached as exhibits to its Answer, Mr. Coblentz discussed this case and indicated that his knowledge about it came from discussions with DDL personnel who attended proceedings before this Court. *Id.* at 3 (citing ECF No. 56-6 (responding to one commenter, "I know several people that were in that court room that it is fact")).

As an initial matter, DDL correctly argues that the Court may not consider Living.AI's additional exhibits because they were not made part of its pleadings. In ruling on a motion to dismiss, "courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The social media posts that Living.AI relies upon do not qualify as a public record; that category is ordinarily limited to official documents and the like. *See id.* at 1197 ("Courts have defined a public record, for purposes of what properly may be considered on a motion to dismiss, to include . . . letter decisions of government agencies . . . and published reports of administrative bodies." (citations omitted)); *Polnac v. City of Sulphur Springs*, 555 F. Supp. 3d 309, 326–27 (E.D. Tex. 2021) (declining to consider screenshots of Facebook posts). And the fact that the posts are "just updated versions of portions of [the] page," ECF No. 71 at 3 n.3, that Living.AI attached to its Answer is immaterial because it is the "exhibits attached to the complaint" that the Court must review, *Keystone*

*Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011) (quoting *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994)). Thus, while Living.AI's additional exhibits may ultimately prove persuasive if attached to an amended Answer—an issue the Court does not address—the Court must disregard them here.

What is left cannot plausibly establish that Mr. Coblentz was acting within the scope of his employment when he posted about Living.AI and this case. As a matter of law, the fact that Mr. Coblentz is employed by DDL cannot establish that his social media posts were within the scope of his employment. *See* Restatement (Second) of Agency (1959) § 228, cmt. b. Nor can the Court reasonably infer from the mere fact that Coblentz identifies himself as a DDL employee on Facebook that his posts were "of the kind [of conduct] he was employed to perform." *Id.* § 228. Otherwise, employers would be potentially liable for the online conduct of their employees based solely upon the employee's independent choice to list their employer on a private social media page. Finally, Mr. Coblentz stating that he was repeating information obtained from DDL personnel does not plausibly bring posting about DDL on social media within the scope of his employment, because it depends on inferential leaps as to whether that conduct is "different in kind from that authorized." *Id.* Indeed, Living.AI has made no allegations about Mr. Coblentz's duties as a DDL employee, or whether the posts were made from work during working hours. In short, the fact that an employee posts about their work online does not give rise to a reasonable inference that doing so is within the scope of their employment, whether based on a theory of actual or apparent authority.

Taking the facts pleaded by Living.AI as true, a finding that Mr. Coblentz's social media posts fell within the scope of his employment would rest on speculation. The information currently pleaded regarding his posts, therefore, cannot serve as a basis to conclude that Living.AI has

plausibly alleged its state-law claims against DDL or Mr. Hanchar. Accordingly, Living.AI's counterclaims will be dismissed to the extent they are based on Mr. Coblentz's statements. However, the Court will grant Living.AI leave to amend.

### B. The Court Will Grant in Part and Deny in Part Living.AI's Motion to Dismiss

Turning to Living.AI's three state law counterclaims, the Court will limit its analysis to Mr. Hanchar's alleged statements, as they are the only other statements specifically pleaded by Living.AI. At this stage of the proceedings, DDL has not challenged Living.AI's allegation that Mr. Hanchar's statements are attributable to DDL, and thus the Court will assume that they are.

#### 1. The Court Will Dismiss Living.AI's Counterclaim for Intentional Interference with Contract

Living.AI's first state-law claim against DDL and Mr. Hanchar is for intentional interference with contract. The elements of such a claim are well established in Pennsylvania:

> (1) the existence of a contractual relationship between the complainant and a third party;
> (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship;
> (3) the absence of privilege or justification on the part of the defendant; and
> (4) the occasioning of actual damage as a result of defendant's conduct.

*Phillips v. Selig*, 959 A.2d 420, 429 (Pa. Super. 2008) (quoting Restatement (Second) of Torts § 766 (1979)). In its Motion to Dismiss, DDL argues that Living.AI has failed to plausibly allege the first and third elements. ECF No. 70 at 5–6. The Court finds both arguments persuasive.

As to the first element—the existence of a contract between Living.AI and some third party—the only specific contract that Living.AI identifies in its allegations comes from a commenter on one of Mr. Coblentz's posts, who said that it was "time to cancel my [EMO] order" after Mr. Coblentz represented that Living.AI would need to "cease production." ECF No. 56-1. But, for the reasons given above, Mr, Coblentz's conduct is not attributable to DDL as pleaded, and Living.AI has not otherwise alleged that DDL interfered with that specific order. As such,

8

that allegedly cancelled order cannot serve as a basis for holding DDL liable. Living.AI otherwise offers nothing more than conclusory allegations that "DDL and/or Mr. Hanchar induced customers to breach their orders," ECF No. 56 ¶ 46, and conclusory allegations cannot overcome a motion to dismiss, *see Twombly*, 550 U.S. at 555. Without more specific allegations, Living.AI has failed to plausibly allege the first element of its claim for intentional interference with contract.

Turning to the issue of privilege, Living.AI concedes that the absence of "privilege or justification is not an affirmative defense, but rather part of the *prima facie* case." ECF No. 71 at 11. As such, Living.AI is required to plausibly allege that Mr. Hanchar's—and, by extension, DDL's—conduct was unprivileged. *Am. Handiwork, Inc. v. 84 Lumber Co.*, No. 2:21-CV-00028-MJH, 2021 WL 3666478, at *3 (W.D. Pa. Aug. 18, 2021) (Horan, J.) ("A plaintiff must demonstrate a lack of privilege or justification as part of its prima facie case for tortious interference of contractual relations, and failure to do so results in dismissal of the claim."). Living.AI failed to do so here.

As stated by the Pennsylvania Supreme Court in *Glenn v. Point Park College*, "[w]hat is or is not privileged conduct in a given situation is not susceptible of precise definition." 272 A.2d 895, 899 (Pa. 1971). The inquiry turns on "whether [the party's] actions were improper," based on the factors set forth in the Restatement (Second) of Torts:

> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference and
> (g) the relations between the parties.

*Salsgiver Commc'ns, Inc. v. Consol. Commc'ns Holdings, Inc.*, 150 A.3d 957, 965–66 (Pa. Super. 2016) (quoting Restatement (Second) of Torts § 767). Applying these factors to the facts alleged

in Living.AI's Answer, Living.AI has failed to plausibly allege that Mr. Hanchar acted without privilege.

First, Living.AI has not even offered a *conclusory* allegation—which would still be insufficient—that Mr. Hanchar's statements were unprivileged. *Cf. Am. Handiwork, Inc.*, 2021 WL 3666478, at *3 (dismissing claim where plaintiff pleaded "nothing beyond a conclusory statement" on privilege element). Its specific allegations fare no better. For its intentional interference with contract claim, Living.AI alleges that "DDL and/or Mr. Hanchar acting on his own or through DDL personnel . . . have instructed Living.Ai's customers to return their EMO robots, and have falsely claimed to have won the litigation and that decisions were made by this Court which have not issued." ECF No. 56 ¶ 45.[3] Although that allegation may have been sufficient had Mr. Coblentz's statements been attributable to DDL, it fails with just Mr. Hanchar's statements for support. For one thing, the only specifically pleaded statement where someone arguably tells a Living.AI customer to return their EMO robot or cancel an order is made by Mr. Coblentz, not Mr. Hanchar. *See* ECF No. 56 ¶¶ 19–20. And unlike Mr. Coblentz, Mr. Hanchar did not represent that DDL won its case against Living.AI; only that DDL "will prevail" after the Court's ruling on Living.AI's motion to dismiss and that he "hope[s]" his "fight" will send a signal to "IP owners out there" that they can win infringement cases. ECF No. 56-8; ECF No. 56-9; ECF No. 56-10. Mr. Hanchar's comments, though perhaps overzealous, were not actionably "improper" in light of this Court's ruling that some of DDL's claims could proceed to discovery. More is needed for Living.AI to allege that his conduct was unprivileged. *See Am. Handiwork, Inc.*, 2021 WL 3666478, at *3.

---

[3] Living.AI does not reference Mr. Hanchar's alleged statements about a "knock off" company or "thieves" as a basis for its intentional interference with contract claim. ECF No. 56 ¶¶ 42–49; *see* ECF No. 71.

In sum, Living.AI's counterclaim for intentional interference with contract is insufficiently pleaded because it does not identify a valid contract that DDL or Mr. Hanchar interfered with and because Living.AI has not pleaded that the conduct attributable to DDL and Mr. Hanchar was unprivileged. Accordingly, the Court will dismiss Count III, but will grant Living.AI leave to amend.

### 2. The Court Will Dismiss Living.AI's Counterclaim for Intentional Interference with Prospective Economic Advantage

Next, Living.AI asserts a claim for intentional interference with prospective economic advantage that is nearly identical to its intentional interference with contract claim. In Pennsylvania, the elements of the two claims are essentially the same, except that the claimant need only plead a "prospective contractual relation between the complainant and a third party" instead of a valid and existing contract. *Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 394 (3d Cir. 2000) (quoting *Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. 1997)). Because Living.AI's claim for intentional interference with prospective economic advantage includes the same "absence of privilege" element as its claim for intentional interference with contract, Count IV will be dismissed for the same reason as Count III: Living.AI has not plausibly alleged that Mr. Hanchar's conduct was unprivileged and Mr. Coblentz's conduct—even assuming it was unprivileged—is not attributable to DDL or Mr. Hanchar.

But the Court will dismiss this claim for an additional reason: Living.AI has also failed to plausibly allege the existence of a "prospective contractual relationship." *Id.* To do so, Living.AI must plead "an objectively 'reasonable likelihood or probability' that the contemplated contract would have materialized absent the defendant's interference." *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 213 (3d Cir. 2009) (quoting *Glenn v. Point Park Coll.*, 272 A.2d 895, 898–99 (Pa. 1971)); *Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.*, No. CIV. 90-7952, 1992 WL

11

97826, at *11 (E.D. Pa. Apr. 30, 1992) ("[E]ven at the pleading stage, a plaintiff may not rest a claim for tortious interference with prospective contractual relations on a mere hope that additional contracts or customers would have been forthcoming but for defendant's interference."). Typically, a claimant satisfies its burden by "identify[ing] specific customer relationships or a mechanism through which the plaintiff would ordinarily secure new contracts." *Sandoz Inc. v. Lannett Co., Inc.*, 544 F. Supp. 3d 505, 512 (E.D. Pa. 2021).

In response to DDL's argument that Living.AI has failed to adequately plead the existence of a prospective contractual relationship, Living.AI again points to exhibits attached to its opposition to DDL's motion to dismiss, not the pleadings. Living.AI argues that these exhibits show that "the network through which contracts arise in this industry is the social media network through which customers and potential customers track new releases, statuses or updates, and product availability." ECF No. 71 at 10. As explained above, however, the Court may not consider exhibits that were not made a part of the pleadings. Nor do those exhibits (or those that were attached to its Answer) support Living.AI's argument. While they show what appears to be a small number of potential customers discussing EMO on social media, that does make social media "a mechanism through which [Living.AI] would ordinarily secure new contracts," *Sandoz, Inc.*, 544 F. Supp. 3d at 512, without further factual allegations. Accordingly, the Court will dismiss Count IV with leave to amend.

### 3. The Court Will Dismiss in Part Living.AI's Counterclaim for Trade Libel

Living.AI's final state-law claim against DDL is for trade libel. In Pennsylvania, the elements of such a claim are: (1) a false statement; (2) publication with intent to cause pecuniary harm; (3) actual pecuniary loss; and (4) knowledge of falsity or reckless disregard of truth or falsity. *Neurotron Inc. v. Med. Serv. Ass'n of Pa., Inc.*, 254 F.3d 444, 448–49 (3d Cir. 2001). DDL

argues that the Court should dismiss Living.AI's trade libel claim because Living.AI has not identified a false statement attributable to DDL or Mr. Hanchar and because Living.AI has failed to allege actual pecuniary loss. The Court finds that a narrow portion of Living.AI's claim survives DDL's motion to dismiss.

As to falsity, Living.AI alleges that Mr. Hanchar "and/or individuals taking direction from DDL" made "false statements about (1) the status of this litigation; (2) the ability of Living.Ai to continue in business and supply production; (3) actions purportedly taken by Living.Ai against Mr. Hanchar; and (4) what the Court allegedly considered and found with regard to software code." ECF No. 56 ¶ 60. As to the first category, Mr. Hanchar's alleged statements about the status of this litigation were not false because, unlike Mr. Coblentz, he did not say that DDL had won the case, only (to paraphrase) that it "was winning." ECF Nos. 56-9, 56-10. The second and fourth categories of statements cannot serve as a basis for liability against DDL and Mr. Hanchar because the only alleged statements covering those categories came from Mr. Coblentz. *See* ECF No. 56 ¶¶ 18–27.

As to the third category, however, Living.AI does allege that Mr. Hanchar said in a social media post that a "knock-off company . . . threatened to . . . have . . . proxies offer 'to contract kill Jacob Hanchar.'" ECF No. 56-12. Although taken out of context it is unclear what company Mr. Hanchar is referring to, the post appears to include a link to a news article about this litigation, giving rise to a plausible inference that the statement implicates Living.AI. *See* ECF No. 56-12. Living.AI has alleged that Mr. Hanchar's "contract kill" statement is false, which is enough to overcome DDL's and Mr. Hanchar's motion to dismiss insofar as it challenges Living.AI's allegations as to falsity.

The Court finds, further, that Living.AI has sufficiently pleaded the pecuniary loss element as to Mr. Hanchar's lone actionable statement.  Ordinarily, a party alleging trade libel must allege actual pecuniary loss with specificity, pointing to, for example, "a general diminution in sales or specific lost sales." *Am. Handiwork, Inc.*, 2021 WL 3666478, at *5.  Living.AI, however, correctly argues that a party alleging libel per se need not plead actual pecuniary loss with specificity and may satisfy the pecuniary loss element with general allegations of economic harm or reputational damage.  *See AC2T, Inc. v. Purrington*, No. 19-5946, 2021 WL 1853354, at *2 (E.D. Pa. May 10, 2021).  Statements that are libel per se include those that "tend to impute to a business insolvency or credit unworthiness, lack of skill or competence in the trade, criminal conduct, or dishonesty or want of integrity."  *Synthes (U.S.A.) v. Globus Med., Inc.*, No. 04-CV-1235, 2005 WL 2233441, at *4 (E.D. Pa. Sept. 14, 2005) (internal quotation marks omitted).

Here, although Living.AI did not use the words "per se" in its Answer, Mr. Hanchar's alleged statement that a "knock-off company . . . threatened to . . . have . . . proxies offer 'to contract kill Jacob Hanchar,'" ECF No. 56-12, clearly qualifies.  The reference to a "contract kill" imputes to Living.AI criminal conduct, and the reference to Living.AI as a "knock-off company" imputes dishonesty to it.  *See Synthes (U.S.A.)*, 2005 WL 2233441, at *4.  Because Living.AI has alleged at least one statement that qualifies as libel per se, its general allegation that it has "suffered economic harm . . . as well as damage to reputation and goodwill," ECF No. 56 ¶ 63, is sufficient to satisfy the pecuniary loss element of a claim for trade libel.  *See Synthes (U.S.A.)*, 2005 WL 2233441, at *4.

Accordingly, the Court will deny Living.AI's Motion in part and grant it in part with respect to Count V.  Insofar as Living.AI's trade libel claim rests upon Mr. Hanchar's "contract kill" statement, it may proceed.  Otherwise, the claim is dismissed with leave to amend.

## IV. Conclusion

For the reasons set forth above, DDL's Motion to Dismiss Living.AI's Counterclaims is hereby GRANTED IN PART and DENIED IN PART as set forth in the accompanying ORDER.

DATED this 28th day of September, 2022.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):

All Counsel of Record