IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DIGITAL DREAM LABS, INC, | |
| Plaintiff and Counter Defendant, | 2:20-CV-01500-CCW |
| vs. | |
| LIVING TECHNOLOGY (SHENZHEN) CO., | |
| Defendant and Counter Claimant, | |
| H. JACOB HANCHAR, | |
| Counter Defendant. | |

**<u>MEMORANDUM OPINION</u>**

Before the Court is Plaintiff Digital Dream Labs, Inc.'s ("DDL") and Counter Defendant H. Jacob Hanchar's Motion to Dismiss Defendant Living Technology (Shenzhen) Co.'s (doing business as "Living.AI") First Amended Counterclaims. ECF No. 80. For the reasons that follow, DDL's Motion will be GRANTED IN PART and DENIED IN PART.

**I.     Background**

This is the third time the Court has ruled on a motion to dismiss either the claims or counterclaims in this case. A more detailed background can be found in the Court's earlier decisions; only the essentials are recounted here. *See* ECF Nos. 54, 73.

DDL and Living.AI are competitors in the market for interactive desktop robots. DDL sells and markets two such robots—VECTOR and COZMO—for which it claims to hold various copyrights and trademarks. ECF No. 27 ¶¶ 5, 15. It alleges that Living.AI, through its rival robot EMO, infringed on those copyrights and trademarks. *Id.* ¶¶ 17, 26. After Living.AI moved to dismiss DDL's infringement claims, this Court ruled that DDL: (1) could proceed on its copyright infringement claim (Count I) as to VECTOR's and COZMO's faces as audio-visual works, though

not their bodies as three-dimensional sculptural works; (2) could proceed on its trademark claim (Count II); and (3) failed to plead its trade-dress claim (Count III). *See generally* ECF No. 54.

In its counterclaims, Living.AI alleges that after the Court ruled on its motion to dismiss, DDL and its CEO, Mr. Hanchar, "began a malicious campaign of disseminating false information about the status of the litigation in an effort to disrupt Living.A[I]'s business relationships and cause harm to Living.A[I]." ECF No. 77 ¶ 19. For example, Living.AI alleges that Steve Coblentz, a DDL employee, posted on Facebook that "EMO is done," that Living.AI was "sued for being a knocking [sic] off and lost," and that Living.AI is a "thief" that was "caught red handed." *Id.* ¶¶ 3, 20–25. Living.AI further alleges that when one social media commenter remarked that the case hadn't been "decided yet," Mr. Coblentz responded that "it has been decided by a federal judge[,] lol[.] They lost." *Id.* ¶ 25. As for Mr. Hanchar, Living.AI alleges that after the Court issued its ruling, he, among other things, declared victory "against China" in a social media post (Living.AI is a Chinese company) and appeared on local news in Pittsburgh "claiming to have won a legal battle." *Id.* ¶ 38.

Based on these and other statements by Messrs. Hanchar and Coblentz, Living.AI brought state-law counterclaims for intentional interference with contract (Count III), intentional interference with prospective economic advantage (Count IV), and trade libel (Count V), in addition to counterclaims seeking declarations that EMO does not infringe upon DDL's copyrights or trademarks (Counts I and II). *See generally* ECF No. 77. DDL moved to dismiss those three claims, and the Court granted DDL's motion in large part. ECF Nos. 69, 73. In doing so, the Court first concluded that Mr. Coblentz's statements could not be attributed to DDL and Mr. Hanchar because Living.AI failed to plausibly allege that Mr. Coblentz made the statements in the scope of his employment. ECF No. 73 at 7–8. The Court then concluded that Mr. Hanchar's

statements failed to give rise to plausible claims except that his online statement that a "knock-off company . . . threatened to . . . have . . . proxies offer 'to contract kill Jacob Hanchar,'" plausibly alleged a claim for trade libel against Living.AI.  *Id.* at 8–14 (quoting ECF No. 56-12).

Living.AI has now repleaded its counterclaims to address the deficiencies identified in the Court's prior ruling.  ECF No. 77.  DDL and Mr. Hanchar, in turn, have again moved to dismiss. ECF No. 80.  With briefing completed, DDL's and Mr. Hanchar's Motion is ripe for adjudication.[1] *See* ECF Nos. 79, 81, 82.

## II.     Standard of Review

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a claim.  In reviewing a motion to dismiss, the court accepts as true the factual allegations supporting the claim and views them in the light most favorable to the party asserting the claim.  *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d. Cir. 2008);  *1600 Walnut Corp. v. Cole Haan Co. Store*, 530 F. Supp. 3d 555, 558 (E.D. Pa. 2021).  Although a pleading need not contain detailed factual allegations to survive a motion to dismiss, it cannot rest on mere labels and conclusions.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007);  *1600 Walnut Corp.*, 530 F. Supp. 3d at 558.  That is, "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555. Accordingly, "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and be "sufficient . . . to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "The plausibility standard

---

[1] This Court has federal question jurisdiction over DDL's copyright and trademark claims, as well as over Living.AI's counterclaims seeking declaratory judgments of noninfringement.  *See* 28 U.S.C. 1331.  The Court has supplemental jurisdiction over Living.AI's state law counterclaims, 28 U.S.C. § 1367.

is not akin to a 'probability requirement,' but it asks for more than the sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

The United States Court of Appeals for the Third Circuit has established a three-step process for district courts to follow in analyzing a Rule 12(b)(6) motion:

> First, the court must "tak[e] note of the elements a [party] must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)). That said, under Rule 8's notice pleading standard, even after the Supreme Court's decisions in *Twombly* and *Iqbal*, a party need only "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Connolly v. Lane Constr. Corp.*, 809 F.3d 780, 788–89 (3d Cir. 2016) (finding that "at least for purposes of pleading sufficiency, a complaint need not establish a *prima facie* case in order to survive a motion to dismiss").

## III. Discussion

As was the case when the Court last ruled on Living.AI's three state-law counterclaims, the key threshold question is whether Mr. Coblentz's statements are attributable to DDL and Mr. Hanchar. After addressing that issue, the Court will turn to DDL's and Mr. Hanchar's counterclaims. The parties, which have cited only Pennsylvania law, implicitly agree that Pennsylvania law controls. *See Commonwealth Cap. Corp. v. Getronics, Inc.*, 147 Fed. App'x 253, 254–55 (3d Cir. 2005) (requiring federal courts to apply the state law that the parties "explicitly or implicitly" have chosen).

4

### A.    Living.AI Has Plausibly Alleged that Mr. Coblentz's Actions Are Attributable to DDL

Mr. Coblentz's alleged statements can support a claim against DDL and Mr. Hanchar only if Mr. Coblentz made the statements while acting within the scope of his employment.  *See Potter Title & Tr. Co. v. Knox*, 113 A.2d 549, 551 (Pa. 1955);  *Wang v. Univ. of Pittsburgh*, No. 2:20-cv-1952, 2021 WL 6051568, at *18 (W.D. Pa. Dec. 21, 2021) (Horan, J.) (dismissing libel and intentional interference claims where plaintiff failed to allege that actions of unidentified parties were attributable to the defendant).   Mr. Coblentz made the statements at issue on social media, so the precise question to answer at this stage is whether Living.AI has plausibly alleged that posting about DDL, its robots, and related topics on social media was within the scope of his employment.  The Court concludes that Living.AI has done so.[2]

Pennsylvania courts follow the Restatement (Second) of Agency to determine whether an employee's actions fell within the scope of their employment such that those actions are attributable to the employer.  *Justice v. Lombardo*, 208 A.3d 1057, 1060 (Pa. 2019).  Under the Restatement,

> (1) Conduct of a servant is within the scope of employment if, but only if:
>      (a) it is of the kind he is employed to perform;
>      (b) it occurs substantially within the authorized time and space limits; [and]
>      (c) it is actuated, at least in part, by a purpose to serve the master . . .
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Restatement (Second) of Agency § 228 (Am. L. Inst. 1958).  Actions not expressly authorized may still be within the scope of employment if they are "of the same general nature as that authorized, or incidental to the conduct authorized."  *Id.* § 229(1).  Notably, "[p]roof that the actor was in the

---

[2] On the scope-of-employment issue, DDL and Mr. Hanchar appear to accept at this stage that if Mr. Coblentz's statements are attributable to DDL, they are also attributable to Mr. Hanchar (and vice versa).  Accordingly, the Court will not separately analyze DDL and Mr. Hanchar.

general employment of the master does not of itself create an inference that a given act done by him was within the scope of employment. *Id.* § 228 cmt. b.

Applying these rules to the pleadings shows that Living.AI has plausibly alleged that Mr. Coblentz's social media activity fell within the scope of his employment with DDL. To begin, Mr. Coblentz held himself out on social media as DDL's Director of Community Affairs and Executive Assistant to the CEO of DDL (i.e., Mr. Hanchar), and used DDL's name and logo in his profiles. ECF Nos. 77-1, 77-9, 77-11. Through those profiles, Mr. Coblentz routinely interacted with other users about DDL's robots and this case, including on forums dedicated to VECTOR. *See, e.g.*, ECF Nos. 77-6, 77-8. In doing so, Mr. Coblentz stated that the information he was sharing came from personnel within DDL and involved in this case. ECF No. 77 ¶ 24. Though not necessarily dispositive on their own, these allegations bolster others that more strongly suggest that posting about DDL on social media was within the scope of his employment.

Two posts in particular demonstrate that posting on social media and interacting with DDL customers on social media was the sort of work DDL employed Mr. Coblentz to perform. First, Living.AI has identified an instance where Mr. Coblentz posted pictures of himself "[h]aving an incredible time representing" DDL at a trade conference, with Mr. Hanchar making similar posts and commenting on Mr. Coblentz's photos, "Thank you for your help!" ECF Nos. 77-12, 77-14, 77-16. Given that Mr. Coblentz appears to have posted about the conference while he was there representing DDL, it is reasonable to infer that doing so was the kind of work he was employed to perform. *See* Restatement (Second) of Agency § 228. Second, on one of his profiles, a purported DDL customer posted a public comment stating that Mr. Coblentz had reached out to her (apparently through social media) about a refund, which suggests that Mr. Coblentz was conducting DDL business through the account and that he had authorization to do so. ECF No.

77-18.  These posts, coupled with Mr. Coblentz's association with DDL in his profiles—which Mr. Hanchar would have been aware of—and the nature of Mr. Coblentz's other posts, demonstrate that posting about DDL (and this case) was at least plausibly "of the same general nature" as that work he was authorized to perform.  Restatement (Second) of Agency § 229(1) .  There is no dispute that Mr. Coblentz's posts were motivated "by a purpose to serve" DDL.  *See id.* § 228(2).

Apart from contesting the allegations suggesting that Mr. Coblentz's social media posts were the sort of work he was employed to perform, DDL and Mr. Hanchar argue that Living.AI failed to plausibly allege that Mr. Coblentz's statements occurred within the authorized time limits of his employment.  ECF No. 79 at 9–10.  That argument also fails at this stage.  For one thing, from the pleadings it is apparent that Mr. Coblentz posted about the trade conference while he was there representing DDL, and thus within the authorized limits of his employment.  ECF Nos. 77-12.  And although most of the social media posts in the pleadings do not include a time stamp, there is one that was posted at 7:42 a.m., which is plausibly within Mr. Coblentz's authorized working hours.  ECF No. 77-10.  In light of these two posts and the similar nature of the other posts identified by Living.AI, it is reasonable to infer that Mr. Coblentz made some or all of the other posts during working hours.

In sum, the Court concludes that Living.AI has plausibly alleged that Mr. Coblentz posted the statements at issue in the course of his employment and thus that the statements are attributable to DDL and Mr. Hanchar.  With that conclusion in mind, the Court turns to the three counterclaims that DDL and Mr. Hanchar have moved to dismiss.

### B.   The Court Will Deny the Motion to Dismiss as to Count III

Living.AI's first state-law claim against DDL and Mr. Hanchar is for intentional interference with contract.  The elements of such a claim are well established in Pennsylvania:

(1) the existence of a contractual relationship between the complainant and a third party;
(2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship;
(3) the absence of privilege or justification on the part of the defendant;  and
(4) the occasioning of actual damage as a result of defendant's conduct.

*Phillips v. Selig*, 959 A.2d 420, 429 (Pa. Super. 2008) (quoting Restatement (Second) of Torts § 766 (Am. L. Inst. 1979)).  Having determined that Mr. Coblentz's actions are plausibly attributable to DDL and Mr. Hanchar, their only remaining argument on this claim is that Living.AI has failed to identify the existence of a contractual relationship between Living.AI and a third party that was interfered with.  *See* ECF No. 79 at 5–10.  The Court disagrees.

In response to DDL's and Mr. Hanchar's Motion, Living.AI points to two of its allegations to demonstrate the existence of such a contractual relationship.  First, it points to a social media conversation where a user named "Asha Contingency Plan McIntyre" asked Mr. Coblentz if she would "have to cancel [her] Emo order?"  ECF No. 77-3.  Mr. Coblentz responded, "I would, they were sued for being a knocking [sic] off and lost.  I wouldn't want to give them anything for stealing something that wasn't theirs."  *Id.*  The user then replied "I see.  Well I only placed my Emo order beginning of February.  I take it they will have to cease production?  At least I still have my Vector pre order."  *Id.*  According to Living.AI, Ms. McIntyre's alleged order is a contract that DDL and Mr. Hanchar (through Mr. Coblentz) interfered with.  Second, Living.AI further alleges that in the period after Mr. Coblentz and Mr. Hanchar made the statements at issue, the number of cancellations Living.AI received doubled from its typical rate, with Living.AI receiving at least seventeen cancellations between March 1, 2022 and March 10, 2022.  ECF No. 77 ¶¶ 60–61.  According to Living.AI, these cancellations reflect underlying contracts that DDL and Mr. Hanchar interfered with.

As for the first allegation (concerning Ms. McIntyre) the Court agrees that Living.AI has not plausibly alleged that her alleged order was cancelled, such that it can serve as a basis for Living.AI's interference claim.  Although Ms. McIntyre inquired about the need to cancel, she never said that she planned to cancel her order or that she did so.  *See* ECF No 77-3.  Indeed, her subsequent inquiry about whether Living.AI would need to stop production suggests that Ms. McIntyre did not want to cancel her order unless Living.AI definitively could not fulfill the order, which was never confirmed.  *See id.*  In the absence of further allegations concerning this specific order, the Court is left to speculate as to whether it was ever actually cancelled and Living.AI has therefore failed to plausibly allege its occurrence.

Turning to the allegation that Living.AI received double its usual rate of cancellations between March 1, 2022 and March 10, 2022, the Court concludes that these allegations are sufficient to allow the claim to proceed.  Notably, DDL and Mr. Hanchar do not address it in their briefing—not even in their reply brief after Living.AI pointed to this allegation as support for Count III.  *See* ECF Nos. 79, 81, 82.  Nor has DDL pointed to authority suggesting that this allegation would be deficient.  Instead, it relies generally on the uncontroversial rule—which Living.AI does not dispute—that a party asserting a claim for tortious interference with contract must plead the existence of a contract that was interfered with.  *See* ECF No. 79 at 5–6.  But that rule does not render the allegation of increased cancellations at the relevant time insufficient because cancelled orders reasonably presuppose an underlying contract for the purchase of an EMO robot.  That being the case, and given DDL's and Mr. Hanchar's lack of argument addressing the seventeen cancelled orders, the Court concludes that Living.AI has plausibly alleged the existence of a contract (or contracts) between itself and a third-party (the customers who ordered and then cancelled EMO robots).

The Court will therefore deny DDL's and Mr. Hanchar's Motion insofar as it asks the Court to dismiss Count III.

### C.    The Court Will Dismiss Count IV with Prejudice

Next, Living.AI asserts a similar claim for intentional interference with prospective economic advantage.  In Pennsylvania, the elements of this claim are essentially the same as one for intentional interference with contract, except that the claimant need only plead a "prospective contractual relation between the complainant and a third party" instead of an existing contract. *Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 394 (3d Cir. 2000) (quoting *Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. 1997)).  In their Motion, DDL and Mr. Hanchar argue that Living.AI has failed to plausibly allege such a prospective relationship.  ECF No. 79 at 11–12.  The Court previously ruled that Living.AI failed to plead that element and will do so again because Living.AI—even with the opportunity to amend its claim—has not added any material allegations that would change the outcome here.

To plead the existence of a prospective contractual relationship, Living.AI must plausibly allege "an objectively 'reasonable likelihood or probability' that the contemplated contract would have materialized absent the defendant's interference." *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 213 (3d Cir. 2009) (quoting *Glenn v. Point Park Coll.*, 272 A.2d 895, 898–99 (Pa. 1971)); *Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.*, No. CIV. 90-7952, 1992 WL 97826, at *11 (E.D. Pa. Apr. 30, 1992) ("[E]ven at the pleading stage, a plaintiff may not rest a claim for tortious interference with prospective contractual relations on a mere hope that additional contracts or customers would have been forthcoming but for defendant's interference.").  Typically, a claimant satisfies its burden by "identify[ing] specific customer relationships or a mechanism through which the plaintiff would ordinarily secure new contracts." *Sandoz Inc. v. Lannett Co.*, 544 F. Supp. 3d 505, 512 (E.D. Pa. 2021).

In its opposition, Living.AI argues that it has identified a mechanism through which it secures new contracts—namely, social media, which is the same mechanism that it pointed to when DDL and Mr. Hanchar last moved to dismiss the claim.  ECF No. 81 at 12–15.  At most, however, Living.AI has pleaded that a limited number of potential customers discussed EMO on social media and used social media (including YouTube) to obtain information about Living.AI's products.  *See id.* at 15.  As the Court has already explained in granting DDL's and Mr. Hanchar's prior motion to dismiss, those facts do not make social media a mechanism through which Living.AI would "ordinarily" or "routinely" bring in new business.  *Sandoz, Inc.*, 544 F. Supp. 3d at 512;  *KBT Corp. v. Ceridian Corp.*, 966 F. Supp. 369, 376 (E.D. Pa. 1997);  *cf. Elias Indus., Inc. v. Kissler & Co. Inc.*, No. 2:20-CV-01011-CCW, 2021 WL 2141509, at *7 (W.D. Pa. May 26, 2021) (web portal where existing customers would submit new orders was a recognized way to obtain new business);  *Liberty Mut. Ins. v. Gemma*, 301 F. Supp. 3d 523, 529, 543 (W.D. Pa. 2018) (established referral relationships that were the "lifeblood" of the business were also sufficient);  *Posner v. Lankenau Hosp.*, 645 F. Supp. 1102, 1112 (E.D. Pa. 1986) (existing referral and consultation patterns at a hospital were a sufficient mechanism).  Otherwise, a producer of goods like Living.AI could bring an interference with prospective economic advantage claim based on a limited social media presence, even where social media never led to new business, let alone "ordinarily" or "routinely."

The closest case this Court has found to Living.AI's allegations is *KBT Corp. v. Ceridian Corp.*, 966 F. Supp. 369 (E.D. Pa. 1997), but a comparison underscores the deficiencies in Living.AI's pleadings.  In *KBT*, the owners of a radio station sued companies that conducted listener surveys, alleging that they underrepresented the radio station's listenership numbers in publications, thereby interfering with the radio station's prospective contracts with advertisers.

*See id.* at 371–72.  In ruling on the defendants' motion to dismiss, the district court concluded that the radio station's owners had plausibly alleged that those publications were a "mechanism that would bring in new business on a regular basis" because advertisers relied on those publications "in making 90% of their time-purchasing decisions." *Id.* at 376.  Here, by contrast, while Living.AI has similarly pointed to a mechanism by which potential customers obtained information about its product—social media—it has failed to take the crucial next step and demonstrate how that information mechanism could reasonably be expected to "bring in new business on a regular basis." *Id.*  It has not, for example, pleaded facts regarding how frequently social media leads to sales or factors into a purchasing decision.  Thus, Living.AI has failed to plausibly allege "an objectively reasonable likelihood or probability" that it would have obtained new customers absent DDL's and Mr. Hanchar's alleged acts of interference.  *Acumed LLC*, 561 F.3d at 213.

Living.AI has therefore failed to state a claim for intentional interference with prospective economic advantage and the Court will grant DDL's and Mr. Hanchar's Motion to the extent that it asks the Court to dismiss Count IV.   Because Living.AI has failed to cure by amendment the same deficiency identified here, the Court finds that further amendment would be futile and therefore will dismiss Count IV with prejudice.  *See Phillips*, 515 F.3d at 245.

> **D.    The Court Will Dismiss Count V Only Insofar as It Targets True Statements Made by Mr. Hanchar**

Turning to Living.AI's final counterclaim, the elements of a Pennsylvania trade libel claim are:  (1) a false statement;  (2) publication with intent to cause pecuniary harm;  (3) actual pecuniary loss;  and (4) knowledge of falsity or reckless disregard of truth or falsity.  *Neurotron Inc. v. Med. Serv. Ass'n of Pa., Inc.*, 254 F.3d 444, 448–49 (3d Cir. 2001).  Here, DDL's and Mr. Hanchar's arguments are particularly dependent on their threshold assertion that Mr. Coblentz's statements are not an appropriate basis for a claim against them.  With that issue already resolved, the Court

concludes that much of Living.AI's claim, as amended, survives DDL's and Mr. Hanchar's Motion to Dismiss.

The trade libel claim rests on statements made by both Mr. Hanchar and Mr. Coblentz. This Court has already ruled that the only statement by Mr. Hanchar that is plausibly libelous is the social media post where he stated that a "knock-off company . . . threatened to . . . have . . . proxies offer 'to contract kill Jacob Hanchar.'"  ECF No. 73 at 12–14 (quoting ECF No. 56-12). Living.AI has not directed the Court to any new allegations regarding statements made directly by Mr. Hanchar.  As for Mr. Coblentz, Living.AI argues that he made numerous libelous statements in his social media posts "about the status of the litigation, the ability of Living.A[I] to continue in business and supply production, and what the Court allegedly considered and found with regard to software code."  ECF No. 81 at 17.  Apart from arguing that Mr. Coblentz's statements are not attributable to them, DDL and Mr. Hanchar offer no argument for dismissing Living.AI's trade libel claim.  *See id.* at 13–15.  Accordingly, the counterclaim may proceed as to the alleged libelous statements made by Mr. Coblentz, as well as the single plausibly libelous statement by Mr. Hanchar that the Court previously recognized in ruling on DDL's and Mr. Hanchar's last motion to dismiss Living.AI's counterclaims.

## IV.    Conclusion

For the reasons set forth above, DDL's Motion to Dismiss Living.AI's Counterclaims is hereby GRANTED IN PART and DENIED IN PART as set forth in the accompanying ORDER.

DATED this 6th day of January, 2023.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):

All Counsel of Record